THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOHN OUTLAW (Impleaded), Defendant-Appellant.

First District (2nd Division)   No. 78-720

Opinion filed August 14, 1979.—Rehearing denied September 11, 1979.

Ralph Ruebner and Patricia Unsinn, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr and James S. Veldman, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE HARTMAN delivered the opinion of the court:

This is an appeal by defendant John Outlaw (hereinafter "Outlaw") from a jury verdict finding him guilty of two counts of murder, one count of conspiracy to commit burglary, one count of burglary and one count of armed robbery. He was sentenced to concurrent terms of imprisonment of 150 to 300 years on each count of murder, 25 to 50 years for armed robbery and 10 to 20 years for burglary.

The appellate issues presented include whether (1) the testimony of an accomplice witness was sufficient to support the conviction of defendant for the murder of two men during an abortive burglary; (2) the trial court committed reversible error in denying defendant's motion to suppress certain statements made by him and should have made specific findings of fact and conclusions of law in ruling on the motion; (3) the State concealed evidence or misled defense counsel with respect to certain evidence; (4) cross-examination of alibi defense witnesses regarding their failure to notify police and the State of defendant's alibi, and comment upon their failure to do so, violated due process and had the effect of shifting to defendant the burden of proving his innocence; (5) prior consistent statements of a witness may be introduced to bolster and corroborate his trial testimony where the statement was made at a time within which the witness had a motive to fabricate; (6) the confrontation

clause requires disclosure of the facts leading to a prior conviction of an accomplice witness to show that the bargain struck by that witness and the State was unduly favorable to the witness; (7) the introduction of certain gruesome photographs and other exhibits denied defendant due process where they related to no disputed issue of fact, are cumulative of other evidence, and tended to inflame the emotions of the jury; and (8) the court erred in admitting certain hearsay evidence over defendant's objections.

For the reasons hereinafter set forth, we affirm.

This case involves the murders of two men, Michael Rysiewicz (hereinafter "Rysiewicz") and Lawrence O'Connor (hereinafter "O'Connor"), who were bludgeoned to death on January 23, 1976, during an abortive burglary of fur trim and leather coats from the Chicago warehouse of the Spiegel Corporation (hereinafter "Spiegel"). Because defendant's conviction is founded substantially upon circumstantial evidence, we will set forth the facts in some detail.

The fur trim and leather coats were located in a locked vault on the fifth floor of a large Spiegel warehouse known as building "K" located at 1200 W. 35th Street, Chicago. Outlaw was one of Spiegel's employees who worked in the warehouse as a shipping clerk on the day of the murders from 7:20 a.m. to 4 p.m. O'Connor was on duty in building "K" as a Spiegel security guard whose work hours began at 4 p.m. and ended at midnight. He was assigned to guard the front door of building "K". Rysiewicz was a Spiegel maintenance man assigned to building "K" where he worked from 9 a.m. until 5:30 p.m. Another Spiegel security guard, working in the building "K" dock area was Alvin J. Holmes (hereinafter "Holmes"). Company rules required that all security guards be unarmed.

On the evening of the murders, Holmes testified, he began work at 4 p.m. and was assigned to the rear gate of building "K". The dock area guarded by Holmes, utilized in loading and unloading of trucks, had 18 docks, numbered 1 through 18, from east to west, and was surrounded by a fence with a single gate for ingress and egress by vehicles. At about 6 p.m., Holmes saw an unfamiliar orange and silver U-Haul truck approach the gate and partially enter the yard. Holmes told the driver, subsequently identified by him as Gregory Williams (hereinafter "Williams"), a cousin of Outlaw, that the area was restricted; no merchandise could be picked up after 4 p.m.; and Williams would have to leave. He gave Williams permission to drive into the yard so as to make a U-turn and saw Williams drive the truck to dock 10, turn it around and then pause. He began walking westward to see why Williams wasn't coming out of the yard and as he did so, noticed that dock door 7 was up almost all the way. He opened the door further and looked inside because the door should have

been down. It was dark outside and the lighting conditions inside "K" building were poor since most of the lights had been turned out for the evening. He saw an individual inside the building some six feet away, about 6'1" tall and weighing from 170 to 175 pounds, and wearing dark clothing, including a coat that came between his waist and his knees. He could not discern facial features but was fairly certain that the individual was a black male. This man ran further into the building eastward and Holmes ran back northward to the guard office at dock 1 and telephoned his supervisor about what he had seen. The U-Haul truck was still within the yard; the driver, Williams, had been conversing with some postal employees near dock 10. Acting upon instructions, Holmes closed the gate so that the U-Haul truck could not exit. Holmes' supervisor arrived at the scene five or six minutes after the call, armed Holmes, and directed him to call Chicago police. The police arrived within a few minutes and took custody of Williams.

At 4 a.m. on January 24, 1976, Holmes attended a police lineup, in a police station known as "Area 3 Homicide," at 39th Street and California Avenue. He identified Williams as the U-Haul truck driver and Outlaw as a Spiegel employee whom he had known for about five years. Outlaw was the same height and weight as the person he saw inside the doorway of dock 7.

Raymond Stafford testified that he was Spiegel's protection manager on the day of the murders, and worked the 4 p.m. to 12 midnight shift. While in his office at 1040 W. 35th Street, he received a phone call to come to "K" building. He went to the main entrance on 35th Street, tried to unlock the door, and then noticed that the door was unlocked; it should have been locked at that time, 6 p.m. The guard who should have been on duty, O'Connor, was not at his desk. Stafford made a cursory search for O'Connor on the first, second and third floors, calling to him in each instance, but received no answer. He then went to the dock area and saw the orange and silver U-Haul truck parked near the gate and instructed Holmes to call the police, giving him a weapon, and telling him to hold Williams until they came.

Frank Cusimano, a Chicago police officer, testified that he was assigned to the 9th District Station at 35th Street and Lowe Avenue on the day of the murders, working from 4 p.m. to midnight. He and his partner, Officer Dave Allen, were assigned to search building "K" at 6:30 p.m. The first floor in the northwest area of the building was poorly lighted and he and his partner were carrying flashlights. He saw a silhouette lying on the floor. With his flashlight he saw a white male lying on his back in a pool of blood, his eyes and mouth wide open, several scratches on his face and a large gaping hole in the left side of his head. Several pieces of brain matter were lying splashed within a 1½-foot area from the top of his head.

He later learned the name of that person to be Michael Rysiewicz. After calling for assistance, he remained at the scene until members of the K-9 police dog search unit arrived.

Theodore Zudyk, a Chicago police sergeant assigned to the K-9 unit, testified that on the day of the murders he was assigned to search the third floor of building "K" at about 6:45 to 7 p.m., together with Officer James Roser and a K-9 dog. He found a large trail of blood leading to and under a door at the east end of the cafeteria; on the other side of the door the trial of blood led to a "gurney" (a wooden pushcart designed to move merchandise, waste paper and refuse), under which was another large pool of blood. After he removed a fiber barrel in the gurney, he saw a middle-aged white male, wearing a guard's uniform, lying on his side at the bottom of the gurney, his face and neck covered with blood with large, gaping puncture wounds apparent. He found no pulse. He later learned that the name of that person was Lawrence O'Connor.

Meanwhile, Williams, the driver of the U-Haul truck taken into custody by police, was removed to the 9th District Station. Williams testified that police examined his wallet which was found to contain John Outlaw's driver's license. He first told the police that he was John Outlaw. He did not remember whether he had Outlaw's social security card in his wallet, or not. He was thereafter removed to Area 3 Homicide. There, at first, he refused to talk to the police about the burglary. Then, he lied to them, but not about the case; he told them nothing about the case. He was later asked about killings at the warehouse. When he told them that he knew nothing about the killings, he was not lying. At about 4 a.m., the police told him what they knew about the case. After talking with his mother, whom he had summoned, he told the police and Michael Crane, an assistant state's attorney, what he knew of the attempted burglary and gave them a 12-page typewritten statement.

Williams, a former Spiegel employee, testified at the trial that in mid-January, Outlaw suggested the burglary of coats at the Spiegel warehouse where Outlaw worked; they would need a truck, which Outlaw asked him to get. Williams agreed and the burglary was tentatively set for Thursday, January 22, 1976. Williams was unable to get the truck that day and Outlaw told him to meet the following morning at 11:45 in front of the bank near the Spiegel complex often used by Spiegel employees to cash their checks. Outlaw also told him that he would give him his driver's license because Williams' license had been revoked. He met Outlaw at the bank on 35th Street at 11:45 a.m. on Friday and Outlaw gave him $80 and his driver's license. Outlaw told him he was to be at Spiegel's at 6 p.m. with the truck, drive into the yard, pull up to dock 8 and Outlaw would have the coats ready. Williams would load the coats on the truck and

leave. He again agreed to commit the burglary as he and Outlaw spoke together in front of the bank.

At about 4:30 or 4:45 p.m. that day, Williams rented a truck at an Arco gas station located at 56th Street and Cottage Grove Avenue. He gave the truck rental people $75 and showed them Outlaw's driver's license. He signed a receipt for the truck in the name of Johnny Outlaw. He left there at about 4:50 p.m., drove to a tavern at 52nd and Halsted where he had a drink, left the tavern and arrived at Spiegel's near 6 p.m. There was too much activity in the yard then; people were still working there and tractors were moving around. He circled the block, came back, parked the truck at about 6:05 p.m., and alighted from the truck. Outlaw joined him at the side of the truck, coming up behind him, and told him that everything was set and that he was to pull his truck into the yard and go to dock 10. Outlaw was then wearing a wool ski cap, a green army-type jacket and dark blue jeans. Thereafter Outlaw left and went back towards the Spiegel building. Williams got back in the truck and drove into the yard, to dock 10. A trailer was already there. He parked his truck as far in as it would go and alighted. A security guard approached him; he told the guard that he was to pick up a package for a friend. The guard told him that nothing could be picked up from the warehouse after 4:30 p.m. He got back into the truck and drove to a point 20 feet from the gate where the security guard stopped him and prevented him from leaving. He was held at gunpoint by the guard until the arrival of the Chicago police.

Chicago Police Officer Joseph Stack testified that he and his partner transported Williams to the 9th District Station after his arrest at Spiegel. At the station, Williams gave them a truck rental receipt and a driver's license, both bearing the name John Outlaw. Because the physical description on the driver's license did not coincide with Williams' appearance, Stack told Williams that he did not believe he was Outlaw, and asked him where Outlaw could be contacted. After considerable investigation, he learned that Outlaw lived at 8338 S. Sangamon Street. Going there, Stack met defendant who was wearing a white terry-cloth robe; his hair was very wet. Inside Outlaw's apartment, they questioned him concerning the U-Haul truck, which he denied renting; and his driver's license, which he stated was in his wallet that had been lost two days before, but was not reported to the police. Stack took Outlaw first to the 9th District, where they arrived at 10 p.m., and then to Area 3 Homicide, where he turned Outlaw over to Investigator Craig Cegielski. Between 1:30 and 2 a.m. the mother of John Outlaw, Sarah Lee Outlaw, signed a consent to search form in the presence of Officers Stack and Cegielski, allowing them to search her home.

Stack and other police officers then proceeded to Mrs. Outlaw's first

floor apartment at 906 W. 53rd Street, in the company of John Outlaw's stepbrother, Anthony Romero, who had a key. They arrived at sometime between 2:30 and 3 a.m. In the kitchen, Stack observed two green plastic garbage bags and one brown paper bag. In the first green bag he observed a pair of brown leather gloves that appeared to be blood stained and a blood stained, torn army-type jacket. Removing nothing from the bag, he summoned evidence technicians and waited until they arrived between 5 and 5:30 a.m. The technicians removed the clothing from the bag, as previously described, and also a pair of blue jeans. They then examined the other green bag, which contained household garbage, and the brown paper bag, in which they found a blood-stained wallet, belonging to the murdered maintenance man, Rysiewicz.

Thomas Bachelder, an evidence technician assigned to the Chicago Crime Laboratory, testified that he and his partner, Officer Hajek, photographed the victims' bodies at the Spiegel warehouse and took blood samples, which were sent to the Crime Lab for microanalysis. They then went to the fire escape at the east side of the third floor. Bachelder observed a piece of twine hanging from the door and through a hole in the door where the door handle used to be. By pulling the twine from outside, the inside handle could be moved so as to open the door. The fire escape was extended downward. A long ladder was positioned near it. In the first floor dock area he saw that the door handle to dock door 10 was broken off; it was dusted for prints, but only smears and smudges were seen. No tools were found in the area. Between dock doors 5 and 6 were found some coats on racks. Bachelder testified that they later received a call to go to 906 W. 53rd Street. In the kitchen of the first floor apartment there, he saw two open green trash bags and one brown paper bag. In one green bag he found blue jeans, a soiled army field jacket and a pair of brown leather gloves. In the brown paper bag was a dark colored wallet which appeared to have blood stains; it contained numerous papers bearing the name Michael Rysiewicz. The wallet and clothing were submitted to the microanalysis section of the Crime Lab.

George A. Spreyne, a police microanalyst examined vials containing blood samples on cotton swabs, blood samples taken from the bodies of the two men at the morgue, and blood samples taken from the bloody clothing recovered from Outlaw's mother's kitchen. He determined that Rysiewicz had blood type A, also the type of blood taken from the first floor of the warehouse and the wallet. O'Connor had blood type B, as was a sample of blood taken from the third floor of the warehouse. Blood type A was found on the left leg of the pants, and types A and B were found on the right pants leg of a pair of blue jeans. Blood type A was found just above the cuffs of both jacket sleeves and both types A and B were found on the front panels of a green, torn army-type jacket. The

jacket possessed a sleeve length of 25″ and the circumference of its base was 46″. A different jacket identified by Spiegel employees as belonging to Outlaw and taken from the employees' work clothes rack at Spiegel's, was found to have a sleeve length of 25″ and a base circumference of 46″. The inseam of the blue jeans found in the kitchen measured 35″ and the waist measured 35″. The inseam of the pants leg of Outlaw's work clothes, similarly identified at Spiegel's, measured 34″ with a 35″ waist.

Anthony Siaulys, a dock guard working at the center of building "K", testified that when he left work at 4:45 p.m. on January 23, 1976, the south fire escape was up and there was no ladder present. When the fire escape stairs are up, a ladder would help reach it. When he left work that day he exchanged greetings with O'Connor who had come on duty.

Vern Bridges, senior stock man for Spiegel, testified that a vault on the fifth floor of building "K" contained coats made with fur and leather; all were locked away when he left work on Friday, January 23, 1976. Several racks of coats were missing when he returned to work on the following Monday; some of them were found near the elevator and some in a gurney.

An employee of the District National Bank of Chicago testified that the payroll check of John Outlaw had been cashed at that bank at sometime between 9 a.m. and 1 or 1:30 p.m. on January 23, 1976.

Dr. Tae An, the coroner's pathologist who performed the autopsies on the bodies of O'Connor and Rysiewicz testified that both sustained extensive skull fractures and hemorrhages. The causes of death were severe damage brought about by repeated blows to their heads with a heavy, blunt object probably having a round striking surface.

Harold Kunz, an investigator assigned to Area 3 Homicide, testified that on January 23, 1976, he and his partner, Officer Small, responded to a call at the Spiegel warehouse, and then went to the 9th District Station and examined an Illinois operator's license and U-Haul rental receipt. He went by automobile to 56th and Cottage Grove and returned to 35th and Racine, checking the odometer on his vehicle. He found an excess of four blocks between the mileage on his vehicle and the difference between the mileage showing on the rental receipt and the mileage recorded on the U-Haul truck odometer parked at the rear of Spiegel's warehouse. Certain numbers and letters appearing in a photograph of the U-Haul truck matched the same numbers and letters appearing on the truck rental receipt.

Michael Crane, an assistant state's attorney, testified that on January 23, 1976, he was assigned to the Felony Review Unit which assists police in determining the propriety of charges to be made in felony cases. At midnight, he arrived at Area 3 headquarters and had a conversation with Investigators Kunz and Cegielski, and then with Williams in Kunz's

presence for 15 or 20 minutes. Thereafter he interviewed Outlaw at about 1 a.m. with only Kunz present. After introducing himself and advising Outlaw of his constitutional rights, he asked if he could tell him anything about the murders and burglary at Spiegel's warehouse. Outlaw denied any knowledge of it. Outlaw then told him that he was employed at Spiegel for a few years. He had worked from 7 a.m. to 4 p.m. on January 23 and was driven to and picked up from work by Gladys Coleman. From work, Outlaw told Crane, he went to his mother's house for a few hours and then to his own house.

Outlaw testified on his own behalf. On the date of the murders he was 24 years of age and resided at 8338 S. Sangamon with Gladys Coleman. He was employed at Spiegel and had worked there four years. On January 23, 1976, he worked on the first floor rear of "K" building from 7:20 a.m. to 4 p.m. He had been on the fifth floor of that building only once per year, usually during inventory time in September or October. He denied that he had ever seen the vault containing the coats. Although he would mail out coats in the course of his employment, he would not know what kind of coat it was because it would be in a box. He had seen leather coats at Spiegel's once or twice but had not seen coats with fur collars.

On Monday of the week of January 23, Outlaw went to his mother's house at 906 W. 53rd Street right after work, with Gladys Coleman. His stepbrother Tony and Williams, his cousin, were also present. He made no agreement with Williams to burglarize Spiegel's. He had his wallet with him on that day but discovered on Wednesday that it was missing. The wallet contained his social security card, driver's license, Spiegel's identification card and some photos. The Spiegel's identification card, Outlaw stated, "you have to have * * * on you to get inside the building." He did not have his card when he went to work on Thursday, or on Friday, the day of the murders, but was able to get into the building. He did not know whether he had his "I.D.," with him on Wednesday, Tuesday or Monday of that week.

On Friday, January 23, defendant testified, Gladys Coleman drove him to work and was to pick him up that evening at his sister's house because the car needed radiator repairs. He left work at 4 p.m. with two co-workers, Randy Smith and Tyrone Turner. He and Turner took an eastbound 35th Street CTA bus, as Smith took a westbound bus. He and Turner alighted from the bus at the Dan Ryan station and boarded an "el" train going south until he got off alone at 55th Street. There he caught a westbound Garfield bus on which he rode to Peoria Street, where he alighted. Neither Smith nor Turner testified. He then went to his sister's home at 53rd and Peoria and arrived between 4:40 and 5 p.m. (He said, on

cross-examination, that this route was faster than taking a nearby southbound Racine Avenue bus (1200 West), which was three blocks west of Peoria.) Only his sister and her children were at home at that time. He left at about 5:30 p.m., when Gladys Coleman picked him up in the car. They went to a store at 47th and Halsted Streets and thereafter went home, at 83rd and Sangamon. At sometime between 7 and 7:30 p.m., he received a telephone call about police looking for him from his stepsister Dolores Romero. He told her to send the police to his house where they arrived between 7:30 and 8 p.m.

Outlaw stated that he did not see Gregory Williams from the previous Monday until about midnight on Friday at the police station. He denied having seen Williams earlier that day, or having given Williams money to rent a truck, or his driver's license, or having told Williams to meet him at about 11:30 that morning. He identified as his property a shirt, trousers and belt which he wore when he worked at Spiegel's and which he left on the rack at the end of the day. He denied owning the torn field jacket, blue jeans or gloves on which blood had been found, and which had been taken from a green plastic bag at his mother's home. He identified a check made out to Johnny A. Outlaw, which he endorsed at 10 or 11 a.m. on January 23. The check was cashed for him by Tyrone Turner. He denied having gone to the bank at all that day. He and his co-workers were permitted to cash checks for other employees at a special "Spiegel's only" teller's cage at the bank to avoid wasting the lunch period waiting in line to cash checks.

Outlaw denied having taken a shower before the police came to his apartment, but stated that he was wearing a shower robe at that time. He went with police to 35th and Lowe, where he stayed for a short time; thereafter to 35th and Racine, the building in which he worked; and then to 39th and California, a police station. There he had a brief conversation with Mr. Crane at about 11 or 12 p.m. on Friday night. At that time, a lieutenant was present, but no one else. Crane asked him whether he knew anything about the Spiegel burglary, which he denied. He might have been asked other questions, but Outlaw had forgotten. He had a second conversation with Crane after midnight and the lieutenant was present again, but no one else. He had a key to his mother's apartment on his keyring but denied having gone there on January 23, 1976.

Defendant's stepsister, Dolores Romero, testified that Outlaw came to her home at about 4:45 p.m. on January 23, 1976, where he played with her children. At that time Tommy Potts, who lived with another of defendant's sisters, Bernice, was present along with another brother, Anthony (Tony) Romero. Defendant remained in her home until 6 p.m. or a little after. He left with Gladys Coleman, who came to pick him up.

At that time, defendant was wearing a long black coat which came half way between his knees and his ankles, called a midi-coat. He had no green bags with him.

At about 10 p.m. Dolores went to the police station at 35th and Lowe together with Gladys and Anthony where she met Bernice and Tommy. They were trying to find out what happened to defendant. She returned home after sending for her mother who was at work in Evanston. She later found police in her mother's house and on the street nearby at about 1:20 a.m. She then went to the police station at 39th Street where she stayed until 5 a.m. She did not know that her brother was arrested until the following day. She later testified that she did not know about the crimes and charges against her stepbrother until two days later when she contacted a lawyer. She did not go to the police or state's attorney's office and tell them that her stepbrother was with her at the time the crimes were committed.

Tommy Potts testified that he lived with defendant's stepsister, Bernice Romero, at 906 W. 53rd Street on the second floor. Defendant's mother, Sarah Lee Outlaw, resided on the first floor. He went to visit the home of Dolores Romero on January 23, 1976 at about 4:45 or 5 p.m. There he saw Dolores, Anthony and defendant. They played cards awhile. Outlaw left the apartment at about 6 p.m. Potts later went to a party at his father's home with Bernice. They watched the 10 p.m. news where on Channel 7 he thought he heard that John Outlaw had been arrested and that two men were dead.

A rebuttal witness testified for the prosecution, John Oxman, business manager for Channel 7 News, which operates a news broadcast at 10 p.m. The company keeps records of all the scripts that are broadcast in the regular course of business. The scripts, also made in the ordinary course of business, are intended for people to read on the air. The script for the 10 o'clock news on January 23, 1976, contained a story concerning a burglary and murders at the Spiegel warehouse. Newscasters are not permitted to deviate from the script or they can be fired. After examining the entire script for that broadcast, he found neither "John Outlaw" nor "Gregory Williams" mentioned.

At the conclusion of all the evidence, the jury found Outlaw guilty of burglary and murder as detailed earlier in this opinion.

## I.

Defendant first asserts there is an absence of evidence corroborative of the accomplice witness testimony given by Williams, which he correctly states, must be regarded with skepticism and caution. He argues that because Williams' version of the act related solely to what occurred but not to who committed the crime, the convictions based upon his

identification cannot stand, citing *People v. Wilson* (1977), 66 Ill. 2d 346, 362 N.E.2d 291. In *Wilson*, the supreme court found the testimony of the accomplice witness there did not meet the requisite standard of proof for several reasons: the accomplice had admitted instigating the commission of the crime; he had been promised immunity in exchange for his testimony; the testimony of the accomplice did not aid in establishing who committed the robbery; the victim not only failed to identify the accused in a lineup, she instead identified another man, the same man, three times; and the physical height of the assailant estimated by the victim was unexplainedly inaccurate by more than one-half foot when compared to the actual height of the defendant. Specifically noted in *Wilson* was the supreme court's continued adherence to the law allowing uncorroborated accomplice testimony as the basis for a conviction when the defendant is found guilty beyond a reasonable doubt. 66 Ill. 2d 346, 349.

The facts in the present case demonstrate the inappositeness of *Wilson*. Here, Williams' testimony reveals, and the jury had the right to believe, that Outlaw instigated the proposed burglary. When Williams was unable to fulfill his role by securing a truck to haul away the stolen merchandise, it was Outlaw, through the permitted use of his driver's license and his providing money from a recently cashed payroll check, that made possible Williams' continued involvement. That Outlaw could be considered by the jury as the assailant was further corroborated by a number of circumstantial facts: his payroll check had been cashed within the time frame in which he was alleged to have given Williams the truck rental money; a man of his approximate height and weight had been seen by a guard inside the warehouse just before the murders were discovered; he revealed to an assistant state's attorney that he had first gone to his mother's apartment after work, the key to which he carried on his keyring; blood of the types possessed by both victims was found on clothing of the approximate size worn by Outlaw, which was discovered by police at his mother's apartment, together with the blood stained wallet which had belonged to Rysiewicz; and the mileage on the truck closely corresponded to the distance traveled by Williams from the Arco station to the tavern to the warehouse and once around the block. On such evidence, it cannot be said that Williams' testimony was uncorroborated nor that Outlaw's conviction rested solely, nor even primarily, upon that testimony.

■■ Unlike *Wilson*, Williams was not promised immunity by the State but was told that the State would agree to a sentence of from 4 to 12 years for violation of probation in a previous robbery charge, two burglary charges and the charge of conspiracy to commit burglary, including the Spiegel burglary. The State also dropped the murder charge. It is true that

Williams had not yet pleaded in the Spiegel burglary case and had not been sentenced; and it was his hope that his sentence might be further reduced; yet the record shows that no such agreement was made with the State. That the testimony given by Williams in the present case must be deemed inherently suspect, as urged by defendant, cannot be disputed. (*People v. Mostafa* (1971), 5 Ill. App. 3d 158, 179, 274 N.E.2d 846.) In light of the substantial corroboration of Williams' testimony by other evidence, however, the jury verdict rests upon sufficient evidence of Outlaw's guilt and fulfills the reasonable doubt standard. *People v. Torres* (1977), 53 Ill. App. 3d 171, 368 N.E.2d 361.

■■ Defendant claims further that because Williams first denied involvement in the Spiegel burglary at all, both to the police and at a preliminary hearing, in an effort to exculpate himself from the crimes and to gain his release, and because he was an addicted narcotics user, among other unsavory background experiences, his lying, perjury and character preclude consideration of his trial testimony entirely as support for defendant's conviction. The testimony and background to which defendant alludes was brought before the jury for its consideration together with the circumstances under which it was given; it was for the jury to determine what credibility, if any, should be given to Williams' statements. *People v. Yarbrough* (1977), 67 Ill. 2d 222, 367 N.E.2d 666; *People v. Jones* (1975), 60 Ill. 2d 300, 325 N.E.2d 601.

The defense presents what it deems to be internal inconsistencies in the testimony of Williams and contradictions between his testimony and other facts shown by the evidence. We have carefully examined the alleged contradictions and conflicts in the evidence and find none of them individually or collectively of a character to require reversal where, as here, the record in its entirety shows sufficient evidence to support defendant's conviction beyond a reasonable doubt. (*People v. Fabian* (1976), 42 Ill. App. 3d 934, 356 N.E.2d 982.) Each of the conflicts and contradictions was subject to cross-examination and comment by defense counsel during the trial. They were for the jury to consider as triers of the facts in coming to their conclusion. *People v. Glaze* (1977), 48 Ill. App. 3d 523, 362 N.E.2d 1287; *People v. Dee* (1975), 26 Ill. App. 3d 691, 325 N.E.2d 336.

II.

Defendant next argues that the State failed to sustain its burden of proving the voluntariness of statements made by him which were brought out during the course of the trial. He contends that the statements were the products of coercion and physical abuse, and assigns error in the trial court's denial of his motion to suppress those statements. The argument made on this point does not identify the statement or statements about

which defendant complains. We are not required to search the record in order to identify error. In all instances of conversation with the police and assistant state's attorney, Outlaw denied any knowledge of the burglary, the murders, or any other incidents connected with the crimes. He admitted that all statements made by him denying his knowledge or involvement in the crimes were voluntary. Defendant's reply brief merely adverts to Outlaw's allegedly having "* * * supplied proof that he had been to his mother's house on the afternoon of the burglary." We presume that this was reference to the testimony of Assistant State's Attorney Michael Crane who asserted that Outlaw orally told him during the course of interrogation that he left work on January 23 and first went to his mother's house for a few hours, thereafter going to his own house, a statement which Outlaw denied having made. Accepting as true defendant's denial of having made such a statement would ordinarily obviate the need for determining its voluntariness from the standpoint of logic, however, considering the contradictions in the evidence with respect to where Outlaw went, and with whom, after leaving the Spiegel warehouse on the day of the attempted burglary and murders, it is apparent that any evidence linking Outlaw with his mother's apartment that night, where the bloodied clothes of Outlaw's size were later found by police, is of a sufficiently serious nature as to warrant closer examination of the circumstances surrounding that statement.

At the pretrial hearing on the motion to suppress only Crane, Investigators Kunz and Cegielski and Officer Stack appeared and testified. Although Outlaw claims that he was beaten by Investigator Cegielski while they were alone in the interrogation room, because a police lieutenant allegedly entered and left the room several times, according to Outlaw, and at one time reportedly asked if Outlaw had been shaken up, his absence along with the absences of patrol wagon police who transported Outlaw to the Cermak Hospital and the absence of hospital personnel at the hearing rendered the State's response to his motion to produce all material witnesses legally insufficient, relying upon *People v. Armstrong* (1972), 51 Ill. 2d 471, 282 N.E.2d 712; *People v. Smith* (1962), 25 Ill. 2d 428, 185 N.E.2d 150; and *People v. Willis* (1975), 26 Ill. App. 3d 518, 325 N.E.2d 715. The principles of law therein enunciated for which defendant contends are correct; however, they fail to support his position in light of the facts of the case at bar.

The hearing on the motion developed a conflict in the evidence as to how and when Outlaw's injury came about. Defendant claims that he was struck on the chest and head by Cegielski while being interrogated by him at sometime between 11:30 p.m. and midnight, requiring four stitches to close a wound above his right eyebrow. Cegielski's version was that Outlaw stumbled and fell at about 5 a.m. while trying to arise from the

chair on which he was seated because his feet became entangled with the legs of the chair. Exacerbating the conflict, Outlaw admitted telling hospital personnel that he sustained his injury when he fell down. He explains that statement as the product of fear that police would retaliate when he was returned to the police station if he had claimed that he had been struck. Outlaw testified that he spoke with Crane after he received his injury, but before he went to the hospital. Crane, Kunz, Stack and Cegielski testified that the injury came four hours after Outlaw was alleged to have told Crane that he stopped at his mother's apartment first before going on to his own home.

■■■ The State recognizes its burden of producing all material witnesses or explaining their absence when a defendant questions the voluntariness of his statement and that it has the burden of adducing clear and convincing proof demonstrating that the injury was not the result of police misconduct. (*People v. Davis* (1966), 35 Ill. 2d 202, 220 N.E.2d 222.) It contends that the evidence reveals the presence of all material witnesses at the hearing and that their testimony supports the trial court's findings of voluntariness. The absence of the lieutenant, the patrol wagon police and hospital personnel who treated Outlaw, the State claims, is explained by reason of their lack of interrelationship with any inculpatory statement made by Outlaw at any of the times of his interrogation, citing *In re Lamb* (1975), 61 Ill. 2d 383, 336 N.E.2d 753, *cert. denied* (1976), 425 U.S. 938, 48 L. Ed. 2d 180, 96 S. Ct. 1672; and *People v. Reader* (1962), 26 Ill. 2d 210, 186 N.E.2d 298. They deny the presence of a lieutenant at all during any of the interrogations and assert that the only lieutenant in the entire building was one who was on duty at the police station at midnight but who never entered the interrogation room and had nothing to do with the case in any respect. In *Lamb*, as in the present case, the missing individual was not alleged to have been present when the suspect's statement was given by that defendant. In *Reader*, the supreme court stated (26 Ill. 2d 210, 217-18):

> "The contention of the defendant that all lock-up keepers, wagon-men, or other police personnel who viewed the defendant while in custody must be called as witnesses to the voluntary nature of the confession is without merit. To compel all police personnel who ever viewed the defendant while in custody to testify as to the voluntary nature of a confession is unreasonable and not required by the test laid down in the *Sammons* case."

The trial court in the present case found that defendant's statements or admissions were voluntary. Considering the totality of the circumstances in the present case, the trial court's finding was not against the manifest weight of the evidence. *People v. Prim* (1972), 53 Ill. 2d 62, 70, 289 N.E.2d 601, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731.

■ Defendant also contends that the trial court is required to make specific findings of facts in denying the motion to suppress. Where the evidence presented sustains the findings of the court, the failure of the judge to make specific fact and law findings does not constitute reversible error (*People v. Townsend* (1972), 6 Ill. App. 3d 873, 286 N.E.2d 801), although such findings are preferred and should be made (*People v. Drury* (1971), 130 Ill. App. 2d 798, 268 N.E.2d 460). In reviewing the transcript of that hearing, we note no request by defense counsel that such findings by the trial court be entered of record, an omission which could have been ameliorated had a timely request been made.

### III.

The next point presented by defendant is that he was denied his right to a fair trial because the State suppressed Outlaw's social security card which had allegedly been in the possession of Williams at the time of his arrest or, alternatively, because the State neglected to correct an answer to an interrogatory which listed the card as a possible item of physical evidence that might be used in a trial. The record reveals that Outlaw denied having given Williams his driver's license, social security card or other identification prior to the burglary. It was his theory that those items, which had been contained in his wallet, were missing two days before the attempted burglary and murder and had somehow been secured by Williams without his consent. Williams was examined regarding whether he was in possession of Outlaw's social security card or whether police took it from him upon his arrest; he testified that he could not remember.

During the trial, defense counsel sought production from the State of the social security card. In response, the State claimed that although a police report mentioned possession by Williams of that card, it had not been inventoried and the state's attorney's office never had it in their possession.

When defense counsel subpoenaed Outlaw's social security card at the trial court's suggestion, the State was required to produce Cegielski who prepared the property inventory. Cegielski told defense counsel that although there was discussion about a social security card, he could not recall whether or not he saw such a card at the station, but that it was not inventoried in any event. Relying upon *People v. Nichols* (1976), 63 Ill. 2d 443, 349 N.E.2d 40; *People v. Wisniewski* (1972), 8 Ill. App. 3d 768, 290 N.E.2d 414; and *People v. Loftis* (1977), 55 Ill. App. 3d 456, 370 N.E.2d 1160, defendant urges he was denied a fair trial because of the suppression of the social security card which could have been used to support his theory of the missing wallet and to impeach the credibility of Williams. In *Nichols*, although the State was in possession of a shoe found

outside an apartment window through which an assailant entered the building there involved, it refused to produce the shoe pursuant to demand, which the supreme court deemed an improper suppression of evidence. In *Wisniewski*, a lead pipe allegedly used by the victim which would have supported the theory of self-defense there raised was not produced by the State although in the State's possession, thereby requiring reversal. In *Loftis*, panties worn by the complainant in a rape case were not produced for inspection by the defense although the condition of the garment tended to negate the alleged element of force. In the instant case, the evidence reveals that although there was a discussion of a social security card belonging to Outlaw, it was neither inventoried by the State nor in its possession, and was not produced because it could not be produced, rather than through prosecutorial refusal to cooperate as in *Nichols*, *Wisniewski* or *Loftis*.

■■ Alternatively, defendant seeks a new trial due to the State's failure or inability to produce the social security card because Outlaw was misled in preparing his defense by virtue of the inaccurate discovery information that he received from the State and the prejudice created by the State's failure to make a timely disclosure that it had no social security card in its possession, relying upon *People v. Richardson* (1977), 48 Ill. App. 3d 307, 362 N.E.2d 1104. The failure of the State to notify the court and defense counsel of the erroneous answer to the discovery request, even though it may have been inadvertent as claimed by the State, constituted error; however, in view of the fact that defendant's theory was both articulated and well supported by evidence of another, more substantial item of identification found in Williams' possession, Outlaw's driver's license, which defendant contended had also been contained in the missing wallet, it cannot be said that defendant was denied presentation to the jury of a defense by virtue of the missing social security card. Further, the State's failure to disclose that the social security card was not in its possession is not commensurate with the elements of entrapment which were implied in *Richardson*.

We find no reversible error with respect to the treatment of the missing social security card by the trial court.

## IV.

As a further ground for reversal, defendant alleges the deprivation of his right to a fair trial when the trial court permitted cross-examination of his alibi witnesses regarding their failure to inform the police of his alibi or to testify at the preliminary hearing although their prior silence and trial testimony was not inconsistent, coupled with the State's argument to the jury which improperly suggested that the witnesses' testimony was a recent fabrication. This, he claims, shifted the burden to defendant to

prove his innocence. Acknowledging defense counsel's efforts to explain the silence of the witnesses by reliance upon the advice of counsel, defendant asserts that this was insufficient to overcome the prejudicial effect of the State's cross-examination and argument and unnecessarily injected into the trial the issue of defendant's exercise of his right to counsel. The foregoing argument is based upon cross-examination of Dolores Romero, Outlaw's stepsister, who stated that she had remained at the police station until 5 a.m., that no one told her that her stepbrother was charged with the crime of murder or burglary or even that he was arrested, which she learned the next day. Over defendant's objection, she was permitted to answer the question of whether she went to the state's attorney's office to tell them that her stepbrother was with her at the time of the alleged crimes, which she answered in the negative. On redirect examination she testified that on January 25 she contacted defense counsel, who was hired to represent both her stepbrother and herself and was directed to follow his instructions. Another basis for defendant's argument is found in the cross-examination of Tommy Potts who lived with another stepsister of defendant, Bernice Romero. He was asked on cross-examination whether he had ever tried to tell police officers at the police station that defendant had been with him when the murders occurred, which he also answered in the negative, asserting that he didn't know when they had occurred. Defendant further claims that comment upon the silence of alibi witnesses by the assistant state's attorney in closing argument was impermissible and deprived Outlaw of his right to a fair trial.

The State maintains that it is proper for a prosecutor, on cross-examination, to inquire into the circumstances of an alibi, citing *People v. Blakes* (1976), 63 Ill. 2d 354, 348 N.E.2d 170, and to inquire of witnesses as to whether they had told the same story previously in order to determine whether the testimony was recently fabricated, relying upon *People v. Clark* (1972), 52 Ill. 2d 374, 288 N.E.2d 363. We agree. We fail to see how such questioning shifted the burden upon defendant to prove his innocence since it was not his silence which was being tested but rather an examination of alibi witnesses which was being pursued. The scope and extent of cross-examination rests primarily within the discretion of the trial court and only when clearly abused, resulting in manifest prejudice to the complaining party, will a reviewing court interfere with the trial court's ruling. (*People v. Ganci* (1978), 57 Ill. App. 3d 234, 240, 372 N.E.2d 1077; *People v. Moss* (1977), 54 Ill. App. 3d 769, 370 N.E.2d 89.) We find neither a clear abuse of discretion nor prejudice to defendant in the cross-examination which had been permitted.

Defendant also identifies error in the trial court's having permitted the State to elicit evidence that defendant was cohabiting with a woman

to whom he was not married and that two of his alibi witnesses were also living under the same arrangement, Potts and Bernice Romero. The record reveals, however, that defendant testified under questioning on direct examination by defense counsel that he was living with Gladys Coleman and that Bernice Romero and Tommy Potts were also living together. Any inferences which may have been drawn from these facts to the detriment of defendant were thus self-inflicted and cannot constitute prejudicial error. The State, in cross-examining Dolores Romero as to whether Tommy and Bernice were living together like defendant and Gladys, did no more than iterate the information previously presented to the jury by defendant.

## V.

Defendant next complains of testimony evoked from Williams, the accomplice witness, that he had made a confession of his part in the burglary only after being apprised of the facts of the case by the police and an assistant state's attorney and that his testimony at trial was substantially what he had told the police and assistant state's attorney on the night of his arrest. The State had moved to introduce the statement given to the authorities by Williams while in custody as a prior consistent statement to rebut the charge of recent fabrication, which was denied. Also, the subject of complaint is the State's comment to the jury on the failure of the defense to impeach Williams with the prior statement. It was the State's theory at trial that evidence of the prior consistent statement was admissible to rebut the charge that his testimony was fabricated after the State had promised him leniency in return for the testimony; however, the defense theorizes that another motive existed for Williams to lie at the station following his arrest, which was to exculpate himself by admitting to a lesser offense and shifting to Outlaw the charges of murder.

The record reveals that the questions articulated by the State were promptly objected to by defense counsel; his objections were sustained and the jury instructed to disregard such answers as were given. Thus, any error which could have resulted from this evidence was cured. (*People v. King* (1963), 29 Ill. 2d 150, 193 N.E.2d 790.) With respect to the closing argument, we find no objection raised by defense to the implication of the prosecutor's remark and defendant thereby waived this point. *People v. Dukett* (1974), 56 Ill. 2d 432, 308 N.E.2d 590, *cert. denied* (1974), 419 U.S. 965, 42 L. Ed. 2d 180, 95 S. Ct. 226.

Defendant also maintains that his cross-examination of Williams was improperly restrictive with respect to the sequence of events which culminated in his entering into a plea bargain with the State and regarding his prior juvenile and criminal background. The foregoing is based upon

testimony by Williams that the State had promised him concurrent sentences of 4 to 12 years imprisonment on a charge of violation of robbery probation, a prior burglary charge and the Spiegel burglary charge. Defendant asserts that because the State admitted that Williams was a thief and a burglar but urged the jury to believe Williams because, although a thief, in this case he was guilty only of the offenses charged on an accountability theory and had told the truth to the jury when he said that he did not commit the murders, wanted no part of them and was not a cold-blooded murderer. Defense counsel thereafter attempted to cross-examine Williams concerning the robbery for which he had received probation. The State's objection to this line of questioning was sustained, and the trial judge required that reference be made only to a violation of probation for robbery, rather than robbery.

The defense also complains of the restrictions made upon cross-examination of Williams with regard to his juvenile background. Defendant argues that the State opened the door to cross-examination of Williams regarding the circumstances of prior offenses committed by him in having elicited on direct examination the particulars of the plea bargain, and it was important for the jury to know details of Williams' criminal background in order for them to assess the degree of leniency which had been afforded him by the State in return for his testimony and whether Williams was in fact also repulsed by the murders which had been committed. Defendant cites *People v. Garrett* (1976), 44 Ill. App. 3d 429, 358 N.E.2d 364, for the proposition that a defendant should be allowed the widest latitude in cross-examination for the purpose of establishing bias, motive or prejudice on the part of a witness. He acknowledges that while ordinarily a witness may be impeached only by proof of a conviction for an infamous crime, the fact that he has been arrested or charged for a crime may be inquired into when such fact may reasonably tend to show that his testimony might be influenced by interest, bias or a motive to testify falsely. *People v. Vagil* (1973), 9 Ill. App. 3d 726, 292 N.E.2d 557.

■■ The issue focuses upon whether defense counsel should have been allowed to inquire into the factual circumstances of the conviction of robbery for which Williams was on probation or whether cross-examination was properly limited to evidence only of the conviction as contended by the State, citing *People v. Halkens* (1944), 386 Ill. 167, 53 N.E.2d 923. There is no evidence that Williams had been directly involved in the slaying of O'Connor or Rysiewicz with the round edged blunt instrument, and no such contention is made. This was not a case where the similarity of crimes committed by a defendant or witness tended to show his capacity to commit such a crime because of his conviction of another, as was the case in *People v. Scott* (1967), 82 Ill.

648

App. 2d 109, 227 N.E.2d 72, relied upon by defendant. There, the similarity in the circumstances of two incidents of rape was properly considered by the triers of fact. There is no suggestion that in the commission of a robbery, Williams had resorted to violence of the character that could reflect upon his capacity to be involved in the heinous crimes committed against O'Connor and Rysiewicz in the present case. We note that in the case of a previous burglary of a K-Mart, cross-examination properly was permitted because of the similarities of the crimes and their circumstances. We see no abuse of discretion with respect to the permitted scope of cross-examination by defendant of Williams in this regard.

■■ Defense counsel also sought to inquire of Williams on cross-examination certain details of the negotiations conducted with the State on his behalf with respect to the plea bargain, particularly for the point that if the jury knew Williams had personally initiated the leniency discussions, they would have been aware of the degree to which Williams' testimony was motivated by his desire to gain his freedom. The record reveals that during cross-examination, Williams had already testified that it was his attorney who had initiated the negotiations, rather than himself, and denied that he had initiated the "deal." Where, as here, the jury has already been apprised of the agreement between defendant and State in detail, that the agreement was in exchange for the testimony which that witness had given at the trial, whether the witness asked his lawyer to initiate the plea bargain or whether the plea bargain negotiations were initiated on his behalf by the lawyer appears to be of little potential prejudicial substance. We find no error in the trial court's rulings in this aspect of the case.

## VI.

For his next ground in support of the appeal, defendant contends that he was denied his right to a fair trial because photographs of the victims and vials of their blood were introduced into evidence and exhibited to the jury as part of the State's case. He refers to evidence given by Officer Cusimano and Sergeant Zudyk who testified to the circumstances of their discoveries of Rysiewicz and O'Connor. Each also identified photographs depicting the bodies they had each discovered and the locations and surrounding circumstances. Also, there was evidence of blood samples taken from the victims, and from the pools of blood in the warehouse, and the stains found on the clothes recovered in the apartment of Outlaw's mother, all found to match the blood types of each of the victims. A deputy medical examiner also testified in detail to the injuries he observed and identified photographs of each victim as depicting those injuries.

All the photographs except one were admitted into evidence over defense objection, as were the vials containing swabs of blood and were exhibited to the jury immediately prior to the State resting. Defendant relies upon *People v. Lefler* (1967), 38 Ill. 2d 216, 230 N.E.2d 827; *People v. Nickolopoulos* (1962), 25 Ill. 2d 451, 185 N.E.2d 209; *People v. Elwell* (1977), 48 Ill. App. 3d 628, 362 N.E.2d 830; *People v. Garlick* (1977), 46 Ill.' App. 3d 216, 360 N.E.2d 1121, *cert. denied* (1977), 434 U.S. 988, 54 L. Ed. 2d 484, 98 S. Ct. 620; and *People v. Jackson* (1956), 9 Ill. 2d 484, 138 N.E.2d 528, in each of which convictions were reversed on the basis of the unnecessary, irrelevant and highly prejudicial effect that might have been aroused by the introduction of photographs of the victims or blood where submitted for consideration by the juries. He maintains that he did not dispute the nature and extent of the injuries suffered by the victims, nor the causes of their deaths, nor the means by which they met their deaths and, therefore, photographs of the blood and the victims, and the vials containing the blood swabs had no relevance to any controverted issue of fact and could not have aided the jury in their determination of whether Outlaw had participated in the crimes. This is particularly true, he argues, because of the explicitness of the testimony by the witnesses earlier mentioned and, therefore, the trial court erred in having overruled his objection to their admittance and display.

■■ The State counters that since the People have the burden of showing cause of death and the physical facts of the murders, the place and manner of finding the bodies, and wounds that they sustained, no error was committed in the admission of these items for the consideration by the jury, relying upon *People v. Foster* (1977), 56 Ill. App. 3d 22, 371 N.E.2d 961, and other similar authorities. The supreme court on June 29, 1979, decided *People v. Foster* (1979), 76 Ill. 2d 365, 392 N.E.2d 6, in which many of the authorities upon which defendant relies were analyzed and the issue of admissibility of such evidence in a homicide prosecution was carefully considered. There, four color photographs of the decedent's decaying and dismembered body were admitted at trial which that defendant contended was cumulative, unnecessary and calculated only to prejudice and inflame the jury, particularly since he did not contest the facts or circumstances of the decedent's demise but raised the defense of mental disease or defect. The supreme court in holding that the trial court had not erred in admitting the photographs stated:

"The underlying problem is that photographs depicting the condition of the decedent normally are probative of one or more issues, such as manner or cause of death, means used, and location of the events in question. That such photographs potentially are prejudicial to the defendant is due largely to their accurate depiction of a horrible crime. While juries are carefully instructed

as to the importance of considering each item of evidence only for particular purposes and not for others, candor compels us to recognize the potentially prejudicial impact of evidence which illustrates the gruesome nature of the offense charged in cases where the criminal responsibility of the accused is at issue because of an alleged 'mental disease or defect.' Nonetheless, faith in the ability of a properly instructed jury to separate issues and reach a correct result is the cornerstone of the jury system, and defendant's brief in this court does not allege, nor does the record indicate, that the jury was improperly instructed as to the purposes for which the photographs were offered.

The major bulwark against prejudicing the jury is the sound discretion of the trial judge. Here, the photographs were probative of the time and manner of the homicidal death and the circumstances of its concealment, which included dismemberment. The admission of all four was not an abuse of discretion." (76 Ill. 2d 365, 378.)

We believe that the reasoning of *Foster* is equally applicable to the facts in this case, and the admission in evidence of photographs and vials containing blood swabs was not an abuse of the trial court's discretion.

## VII.

Defendant's remaining points concern the allegedly improper admission of hearsay evidence as grounds for reversal.

Earl Butler, a co-employee of Outlaw at Spiegel, identified certain clothing as belonging to Outlaw at the trial. John Scheer, department manager at Spiegel, testified that Earl Butler had pointed out certain clothes as being the work clothes of Outlaw. Scheer was the person who brought the work clothes to the police in a bag. Defendant claims that it was error for the State to give the jury the impression that Butler's identification of Outlaw's work clothes was corroborated by other Spiegel employees who had not been produced as witnesses and argues that although the trial judge sustained defense objections to the hearsay evidence, it cannot be assumed that the jury was not influenced by the State's suggestion on cross-examination of Outlaw that other out-of-court identifications had been made of the clothing. As defendant admits, defense objections were sustained. We fail to see how the court's sustention of the defendant's objections can be deemed error.

■■ With respect to the second incident, the testimony of John Oxman and a Channel 7 news script were introduced to rebut the testimony of Potts that he thought he heard defendant's name mentioned in connection with the Spiegel murders on the 10 o'clock news over Channel 7 in

Chicago. The script indicated that Outlaw's name was not mentioned. Defendant argues that because Oxman had not viewed or heard the actual news script in question as read but merely produced and read to the jury the script regarding the Spiegel incident which had been prepared by someone other than himself prior to the newscast, it should not have been admitted. The defense arrives at this conclusion because the script was not made at the time of the broadcast, or within a reasonable time thereafter, but was prepared in anticipation of the broadcast, relying upon section 115—5(a) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1977, ch. 38, par. 115—5(a)) which permits the admission of any writing or record in evidence if made in the regular course of any business, if it was the regular course of such business to make such writing or record at the time of such act or event or within a reasonable time thereafter. The State argues that the script was not placed in evidence to prove what the news reader actually said but merely to show that the written script did not mention defendant's name and that the script was not admitted to show the truth of what it contained but rather that defendant's name did not appear, citing *People v. Carpenter* (1963), 28 Ill. 2d 116, 190 N.E.2d 738. Whether Potts correctly "thought" he had heard mention of Outlaw's name on the newscast or not appears to have little bearing upon any substantive issue presented in this appeal. Although the question of whether the script having been prepared before the newscast could have qualified as a business record under the statute is debatable, its admission, if error, was harmless.

From the foregoing it appears that defendant's conviction by the jury was proved beyond a reasonable doubt and therefore must be affirmed.

Affirmed.

DOWNING and PERLIN, JJ., concur.