(No. 50462.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant,
v. SIDNEY FOSTER, Appellee.

*Opinion filed June 29, 1979.*

William J. Scott, Attorney General, of Springfield, and Bernard Carey, State's Attorney, of Chicago (Donald B. Mackay and Melbourne A. Noel, Jr., Assistant Attorneys General, of Chicago, and Lee T. Hettinger, Iris E. Sholder, and Joseph P. Quirk, Assistant State's Attorneys, of counsel), for the People.

Ellis E. Reid, of Chicago, for appellee.

MR. JUSTICE CLARK delivered the opinion of the court:

A jury in the circuit court of Cook County convicted the defendant, Sidney Foster, of murder and concealment of a homicidal death in connection with the death of Vivian Patterson. With one judge dissenting, the appellate court reversed and remanded (56 Ill. App. 3d 22), holding (1) that the State had failed to prove beyond a reasonable doubt that defendant had caused the death of the victim, (2) that the State had failed to prove defendant's sanity at the time of his concealment of the victim's homicidal death, and (3) that the trial court had committed plain error by failing to hold a hearing to inquire into the defendant's alleged incompetency to stand trial. We

granted the State's petition for leave to appeal, and we now reverse.

We turn first to the alleged insufficiency of the evidence as to the cause of the decedent's death. (The length of the record in this case (over 2,000 pages) precludes effective summarization of its every nuance. We therefore will set forth only such evidence as is necessary to illustrate the error of the appellate court's holding on this issue.) The defendant, who was a music promoter, had lived with the decedent, who was a singer, and her four children for approximately 2½ years at the time of her death. The relationship between the defendant and the victim was complicated by defendant's transsexuality; *i.e.,* he considered himself a woman. Nonetheless, the defendant claimed to be the father of the victim's 12-year-old son, Solomon. Solomon, however, testified over defendant's objection that the defendant had forced him to engage in homosexual behavior with the defendant.

Chicago Police Officer Patrick Carroll testified that, as reflected in his official police report on the day after the defendant's arrest, Diane Adams, an acquaintance of the defendant, told him and other police officers that early in December 1973 the defendant had told her that he was distressed by the possibility that the decedent would move to California without him, taking Solomon away from him. At trial, Ms. Adams denied having made the foregoing statement to police.

On or about December 18, 1973, the defendant borrowed a .38-caliber Roehm revolver and six .38-caliber bullets from Edward Thomas, a musician, telling Thomas that he (defendant) needed the gun because of harassment in connection with his music recording business. The defendant refused to handle the gun in Thomas' presence, and Thomas placed the gun and ammunition in a camera case that the defendant had brought with him for that purpose.

During most of the Christmas holiday period the decedent's children were out of the apartment, staying

with their mother's ex-husband, Lucius Hudson. One of the children, Sandra Hudson, visited the apartment on December 27 or 28, at which time she saw her mother, but when Sandra visited again on December 29 or 30, she did not see her mother. Defendant told Sandra that the decedent was in California. Solomon, too, was unable to reach his mother when he called home on or about December 29, and defendant told him also that his mother was in California.

Sometime during the day of December 31, 1973, Edward Thomas called the defendant, asking for the return of his gun. At about 5:30 or 6:30 that evening, the defendant returned the weapon to Thomas, but returned only two of the six bullets, telling Thomas that "he thought he got the dude and wouldn't be needing the gun any more."

On or shortly before that same evening, the defendant offered $5,000 each to Wilbur Richburg and Marvin Morgan to dispose of decedent's body. Both Richburg and Morgan testified that they observed the decedent's deteriorating corpse at this time, though their testimony is not completely consistent as to whether this occurred on or before New Year's Eve. Neither, however, testified to seeing Solomon at the apartment, and Solomon testified that he was at home New Year's Eve.

Upon their return home from Lucius Hudson's house, the decedent's children noticed a "bad smell" coming from their mother's locked bedroom. Sometime in mid-January, Richburg and Morgan returned to the decedent's apartment, where they dismembered her corpse and transported it to the trunk of defendant's car, where police officers discovered it on January 23, 1974. The State's medical expert testified that death was due to bullet wounds, and the State's firearms expert testified that a .38-caliber bullet recovered from the corpse had characteristics consistent with its having been fired from a .38-caliber Roehm

revolver. However, about four days after defendant returned the revolver to Edward Thomas, Thomas loaned it to someone else, who disposed of it while being pursued by police officers in connection with another matter. Because the revolver was not recovered, the State neither was able to demonstrate that the weapon which the defendant had borrowed was the same weapon, nor even the same model as that which had fired the bullet recovered from the victim.

Two defense witnesses and one State witness who was a friend of the defendant testified that they had spoken with the decedent after December 31, 1973. The defendant's theory was that someone known as "Jiggy" or "T-bone" had killed the decedent, but the defendant gave different motives at different times for Jiggy's alleged action. At one time defendant claimed that the motive involved sex, at another time he claimed it involved drug traffic. At one time he even suggested that "Jiggy" and two accomplices had dismembered and disposed of decedent's corpse.

The appellate court held that, as a matter of law, the foregoing evidence left a "reasonable doubt" of the defendant's guilt. We disagree.

"This court has often held that it is the function of the trier of fact to determine the credibility of the witnesses, the weight to be given to their testimony and the inferences to be drawn from the evidence. [Citations.] Where the evidence is merely conflicting a court of review will not substitute its judgment for that of the trier of fact. [Citation.]" (*People v. Akis* (1976), 63 Ill. 2d 296, 298-99.) Nor has the State failed to exclude every reasonable hypothesis consistent with innocence. (*Cf., e.g., People v. Garrett* (1975), 62 Ill. 2d 151, 163.) The State may exclude the defendant's theory by introducing evidence which indicates that the defendant is lying, because the jury is not required to believe the defendant. (*People v.*

*Heflin* (1978), 71 Ill. 2d 525, 533-34.) Rather, time after time, this court has articulated the following standard: "The jury need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances relied upon to establish guilt, but it is sufficient if all the evidence, taken together, satisfies the jury beyond a reasonable doubt of the accused's guilt." *People v. Bernette* (1964), 30 Ill. 2d 359, 367; *People v. Marino* (1970), 44 Ill. 2d 562, 580; *People v. Williams* (1977), 66 Ill. 2d 478, 485.) The evidence here satisfied that standard.

We note here our agreement with the appellate and circuit courts' rejection of the defendant's objections to the admission into evidence of (1) Solomon's testimony as to his relationship with the defendant and (2) four exceptionally gruesome photographs depicting the condition of the decedent's corpse, as found by the police. As to the first point, the law is clear: Evidence which is otherwise admissible to establish motive is not rendered inadmissible by its potentially prejudicial impact. "Of course the guilt of an accused cannot be established by proving that he committed other offenses and so is an evil man and therefore more likely to have committed the crime charged. But evidence that tends to prove a fact in issue in the case is admissible even though it discloses that the defendant committed another crime. So evidence that tends to prove motive or intent, identity, knowledge, absence of mistake or accident, and the like, is admissible although it may also involve proof of a separate and distinct offense by the accused." (*People v. Harvey* (1957), 12 Ill. 2d 88, 91 (evidence of incestuous relationship with daughter).) Solomon's testimony not only was relevant, but was central to the establishment of defendant's motive for killing Solomon's mother, because that testimony tended to establish a reason why defendant would fear the decedent's taking Solomon away from him, to California or elsewhere, regardless of decedent's alleged ignorance of

the relationship between Solomon and the defendant. Accordingly, Solomon's testimony properly was admitted. See also *People v. Branion* (1970), 47 Ill. 2d 70, 77 (evidence of adultery), *cert. denied* (1971), 403 U.S. 907, 29 L. Ed. 2d 683, 91 S. Ct. 2213.

The four color photographs of the decedent's decaying and dismembered body which were admitted at trial are quite gruesome, and defendant contends that the admission of all four was cumulative, unnecessary, and calculated only to prejudice and inflame the jury. We disagree. This court has, on many occasions, considered the problem of the admissibility, in a homicide prosecution, of photographs depicting the condition of the decedent. See, *e.g., People v. Owens* (1976), 65 Ill. 2d 83, 90, *cert. denied* (1977), 430 U.S. 955, 51 L. Ed. 2d 805, 97 S. Ct. 1600; *People v. Henenberg* (1973), 55 Ill. 2d 5, 13-14; *People v. Nicholls* (1969), 42 Ill. 2d 91, 99, *cert. denied* (1970), 396 U.S. 1016, 24 L. Ed. 2d 507, 90 S. Ct. 578; *People v. Speck* (1968), 41 Ill. 2d 177, 202, *death penalty vacated sub nom. Speck v. Illinois* (1971), 403 U.S. 946, 29 L. Ed. 2d 855, 91 S. Ct. 2279, *on remand* (1972), 52 Ill. 2d 284; *People v. Lefler* (1967), 38 Ill. 2d 216, 221; *People v. Myers* (1966), 35 Ill. 2d 311, 331, *cert. denied* (1967), 385 U.S. 1019, 17 L. Ed. 2d 557, 87 S. Ct. 752; *People v. Hoffman* (1965), 32 Ill. 2d 96, 100; *People v. Kolep* (1963), 29 Ill. 2d 116, 124; *People v. Adams* (1962), 25 Ill. 2d 568, 573; *People v. Jackson* (1956), 9 Ill. 2d 484, 490-91, *appeal after remand* (1966), 23 Ill. 2d 263; *People v. Jenko* (1951), 410 Ill. 478, 482.

Almost three decades ago, in *Jenko,* the court set forth the rule which it has since adhered to:

"Evidence having a natural tendency to establish the facts in controversy should be admitted. A party cannot have competent evidence excluded merely because it might arouse feelings of horror and indignation in the jury. Any testimony

concerning the details of a murder or other violent crime may have such tendencies, but manifestly this could not suffice to render it incompetent. Of course, where *spectacular* exhibits having little probative value are offered for the principal purpose of arousing prejudicial emotions they should be promptly excluded. But questions relating to the character of the evidence offered, and the manner and extent of its presentation, are largely within the discretion of the trial judge, and the exercise of that discretion will not be interfered with unless there has been an abuse to the prejudice of the defendant." (410 Ill. 478, 482.)

That rule has been applied in a variety of situations. In *Jenko,* the admission of photographs depicting stab wounds, with a two-inch rule opposite the wounds for purposes of comparison, was held not to be an abuse of discretion, in that they tended to demonstrate "[t]he fact and cause of death, the number and location of the wounds, the manner in which they were inflicted, and the wilfulness of the acts in question *** [all of which were] material to the offense charged." (410 Ill. 478, 482.) In *People v. Jackson* (1956), 9 Ill. 2d 484, 490-91, however, the issue involved "a photograph of the deceased taken at the hospital after the autopsy. It show[ed] the face and neck of an obese Negro lady with her mouth slightly open and her eyes nearly shut. And there appear[ed] rather distinctly some of the sutures of the autopsic incision," "a feature which accentuated its inflammatory character." The court reasoned that, in that case, the autopsic incisions tipped the balance against admissibility of the photograph, and ordered that, at defendant's new trial (which he had won on other grounds), the photograph must be excluded. The court went on to add that, "[m]indful of the prejudicial emotion that might be

aroused by the introduction of a victim's photograph, the courts have, on the whole, been strict in their requirement that a proper purpose be shown for the introduction of such an exhibit." (9 Ill. 2d 484, 490.) This court relied upon *Jackson* in a subsequent case, *People v. Lefler* (1967), 38 Ill. 2d 216, 221, wherein it disapproved the admission of color photographs of the victim taken during autopsy and projected on a 44-inch by 26-inch screen at trial. In general, however, the "strict requirement" of a "proper purpose" articulated in *Jackson* has eroded to a large extent in subsequent cases.

In *People v. Hoffman* (1965), 32 Ill. 2d 96, 100, for example, the court found no abuse of discretion in the admission of three photographs depicting the wound- and burn-covered nude body of the decedent from different angles, despite the court's belief that "[t]he pictures depict a brutal and intentional crime by a sadist and are bound to arouse feelings of horror and disgust in a normal person." Similarly, in *People v. Speck* (1968), 41 Ill. 2d 177, 202, the court found no abuse of discretion in the admission of photographs depicting the condition and position of several victims of a multiple murder. The court noted that the photographs corroborated "to some extent" the testimony of the sole surviving occurrence witness, showed premeditation and planning, and rebutted defendant's claim of having suffered an "insane frenzy." (41 Ill. 2d 177, 203.) The court stated a less strict standard than *Jackson's* in ruling: "It is the rule that where photographs are relevant to establish any fact in issue that they are admissible in spite of the fact that they may be of a gruesome nature." (41 Ill. 2d 177, 202.) Also, in *People v. Henenberg* (1973), 55 Ill. 2d 5, 13-14, the court held that, despite extensive oral testimony on the same subject, three photographs, one in color and two in black and white, depicting the decomposed skull and left arm of the decedent properly were admitted to corroborate testimony

as to the cause of death and identity of the victim. It is also clear that a defendant's offer to stipulate as to the matters shown by photographs does not render them inadmissible. *People v. Speck* (1968), 41 Ill. 2d 177, 202-04; *People v. Nicholls* (1969), 42 Ill. 2d 91, 99.

The underlying problem is that photographs depicting the condition of the decedent normally are probative of one or more issues, such as manner or cause of death, means used, and location of the events in question. That such photographs potentially are prejudicial to the defendant is due largely to their accurate depiction of a horrible crime. While juries are carefully instructed as to the importance of considering each item of evidence only for particular purposes and not for others, candor compels us to recognize the potentially prejudicial impact of evidence which illustrates the gruesome nature of the offense charged in cases where the criminal responsibility of the accused is at issue because of an alleged "mental disease or defect." Nonetheless, faith in the ability of a properly instructed jury to separate issues and reach a correct result is the cornerstone of the jury system, and defendant's brief in this court does not allege, nor does the record indicate, that the jury was improperly instructed as to the purposes for which the photographs were offered.

The major bulwark against prejudicing the jury is the sound discretion of the trial judge. Here, the photographs were probative of the time and manner of the homicidal death and the circumstances of its concealment, which included dismemberment. The admission of all four was not an abuse of discretion.

The appellate court also held that the State had failed to establish defendant's sanity at the time of his concealment of decedent's death. Here too, the appellate court invaded the province of the jury. The well-established rule in Illinois is that once a defendant introduces evidence which, if believed, would create a reasonable doubt as to

whether, at the time of the alleged crime, "as a result of a mental disease or mental defect," the defendant possessed "substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law" (Ill. Rev. Stat. 1971, ch. 38, par. 6–2), the burden shifts to the State to prove beyond a reasonable doubt that the defendant possessed the requisite mental capacity at the time of the alleged crime. (*People v. Redmond* (1974), 59 Ill. 2d 328, 336-38.) In the instant case, defendant's expert witness testified that, on the basis of his 90-minute interview with the defendant approximately 18 months after the crime in question, it was his expert opinion that, at the time of the events in question, the defendant "did not have the capacity to recognize and appreciate the intent and severity of the act of what he was doing."

This testimony, which was the opinion of a qualified expert witness, adduced in response to a question posed in terms of the language of section 6–2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1971, ch. 38, par. 6–2) quoted in *Redmond,* was sufficient to shift the burden of proof on this issue to the State. However, defendant's expert witness later admitted that his opinion was based on his belief that the defendant had not committed the homicide but instead had been traumatized by witnessing "Jiggy's" commission of the crime. Accordingly, by proving beyond a reasonable doubt that defendant had committed the homicide, the State also completely undercut the foundation for the expert opinion. In addition, the State demonstrated, through the testimony of other witnesses, that the defendant understood that his actions were unlawful and that the decedent's children would always hate him for what he had done. The State also presented evidence which, if believed, demonstrated the defendant's immediate, elaborate efforts to concoct a story about "Jiggy," and his deliberate pattern of first obtaining a gun,

concealing it from the decedent, killing her while no one else was around, and later concealing her death. His elaborate, untruthful stories tended to establish his understanding of the criminality of his conduct, and his stealth in killing the decedent tended to establish his capacity to have conformed his behavior to the requirements of law, if he had so chosen. Although Diane Adams testified that she thought the defendant was insane, and although defendant claims that his suicide attempt while in custody demonstrates insanity, the weight to be given these matters and the other evidence was a question for the jury, whose verdict, on this record, should not have been overturned. *Cf., e.g., People v. Redmond* (1974), 59 Ill. 2d 328, 339, *People v. Ward* (1975), 61 Ill. 2d 559, 568.

The third alternative ground on which the appellate court reversed the defendant's conviction was its holding "that the suggestion of mental incompetency raised by defense counsel \*\*\* sufficiently raised the issue of defendant's fitness to stand trial, and it was error for the trial court to proceed before conducting a fitness hearing pursuant to section 5–2–1 of the Unified Code of Corrections." (56 Ill. App. 3d 22, 38.) There are several problems with this holding. The first problem is that, in his post-trial motion filed pursuant to section 116–1 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1971, ch. 38, par. 116–1), the defendant did not allege that the trial court's refusal to hold a competency hearing was erroneous. This waived the issue. (*People v. Precup* (1978), 73 Ill. 2d 7, 16.) Nor does the savings clause of Rule 615(a) (58 Ill. 2d R. 615(a)) regarding "[p]lain errors or defects affecting substantial rights" apply here. " 'Before plain error can be considered as a means of circumventing the general waiver rule, it must be plainly apparent from the record that an error affecting substantial rights was committed.' " (*People v. Coles* (1979), 74 Ill. 2d 393, 397, quoting *People v. Precup* (1978), 73 Ill. 2d 7, 17.) The

defendant claims that, despite his failure to preserve any record of the proceedings on his motion for a competency hearing, the alleged error is plainly apparent from the motion itself. The motion, however, merely recites that counsel "had reasonable cause to believe that defendant may be presently insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly to assist in his own defense, and to have been so at the time of the alleged offense of concealment of a homicide." Ignoring, for the moment, counsel's confusion of two separate and distinct issues (*i.e.,* lack of criminal responsibility due to lack of the requisite mental capacity at the time of the crime vs. inability to assist in one's own defense at the time of trial (*cf.* generally, *People v. Manning* (1979), 76 Ill. 2d 235; *People v. Lang* (1979), 76 Ill. 2d 311)), it is settled law in Illinois that counsel's mere assertion that he has reason to believe that the defendant may be unable to understand the charges or assist in his defense is not sufficient to create the "bona fide doubt" of defendant's fitness which triggers the obligation to hold a fitness hearing pursuant to section 5—2—1 of the Unified Code of Corrections (Ill. Rev. Stat. 1973, ch. 38, par. 1005—2—1). (Compare *People v. Foley* (1963), 28 Ill. 2d 426, 428, with *People v. Thomas* (1969), 43 Ill. 2d 328, 332-33.) Rather, the court must be presented with facts creating a *bona fide* doubt of defendant's fitness, and the motion in this case presented no such facts. (We note in passing that, on the basis of the record before us, no claim can be made that the necessary facts were not disclosed because they were protected against disclosure by the attorney-client privilege. (*Cf.* generally, *Holloway v. Arkansas* (1978), 435 U.S. 475, 487 n.11, 55 L. Ed. 2d 426, 436 n.11, 98 S. Ct. 1173, 1180 n.11. (Facts necessary to the establishment of an attorney's conflict of interest may fall within the scope of the attorney-client privilege and their disclosure may be

prejudicial to the client.)) Accordingly, the appellate court erred in deciding this issue.

Defendant also argues that the judgment of the appellate court ought to be affirmed on two grounds previously rejected by that court. First, defendant contends that the circuit court erred in rejecting as untimely his motion to suppress the fruits of a search of the decedent's apartment. The record, however, unequivocally supports the decision of the circuit court on this question. On the fourth day of defendant's trial, in the midst of the State's examination of one of its witnesses, Officer Savage, the defendant's attorney orally moved to suppress the fruits of a search of the decedent's bedroom. (The specific items sought to be suppressed are nowhere identified in defendant's brief in this court. However, according to the State, these items included bloodstained bedsheets and a photograph of a bloodstained mattress.) The State objected to the motion, because the defendant had notice, in the form of a police report made available during discovery, that a search of the decedent's bedroom had occurred. The police report made no mention of any search warrant having been obtained prior to that search. Since the only apparent ground for defendant's motion to suppress the evidence seized from the bedroom was the failure of the police to obtain a warrant prior to their search, the defendant had notice of the grounds for his motion prior to trial.

The rule in this State is clear. A motion to suppress the fruits of an illegal search must be made in writing, and prior to trial, except where fundamental fairness requires otherwise, such as where the defense did not have adequate notice of the grounds for such a motion. (*People v. Johnson* (1967), 38 Ill. 2d 399, 402-03.) No such circumstances are presented here.

This rule serves important purposes, in that it permits the more orderly and expeditious trial of the question of

the guilt or innocence of the accused, yet still gives the accused an adequate opportunity to litigate collateral issues involving alleged violations of his constitutional rights. (See 3 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment 476-77 (1978).) The rule must be enforceable if its purposes are to be served. The circuit court properly applied the rule here, and its judgment on this issue accordingly is affirmed.

Finally, defendant contends: "The prosecutor in the trial of this case clearly withheld evidence favorable to the defense. This we contend is a violation of the rule in *Brady v. Maryland*, 373 U.S. 83, [10 L. Ed. 2d 215,] 83 S. Ct. 1194 (1963). This is so even though the evidence came out at trial because the defendant would have been better able to prepare his defense had he had this information *prior to trial*." (Emphasis in original.)

Neither defendant's brief in this court nor his post-trial motion in the trial court expressly identifies the evidence allegedly "withheld" by the State. While the brief's "Statement of Facts" refers to a detailed description of Jiggy and the other two alleged offenders contained in some handwritten notes of Investigator Bobko which had been suppressed from discovery, the opinion of the appellate court states that "[t]he particular evidence claimed to be secreted was the fact that Mr. Samuel Thomas had seen the victim alive after January 1, 1974" (56 Ill. App. 3d 22, 37), and defendant's brief in this court states that "[t]he facts relevant to this appeal are correctly stated in the opinion of the appellate court." The only reasonable reading of defendant's brief is that his allegation of error on this issue, to the extent that it has been preserved at all, is confined to the alleged "withholding" of the statement of Samuel Thomas, regarding his having seen the decedent alive on January 4, 1974. The record indicates that, about a week before he testified, Thomas told the prosecution of having seen the decedent sometime

during the first week in January, but that the prosecutor did not relay this information to the defense. In the hearing on defendant's post-trial motion, the prosecutor told the court that defense counsel learned of Thomas' statement on the morning he testified. That testimony also was heard by the jury, in response to a question put by defense counsel on cross-examination. Because the evidence in question was heard by the jury, its alleged suppression does not literally fall within the scope of *Brady*, as restated in *United States v. Agurs* (1976), 427 U.S. 97, 103, 49 L. Ed. 2d 342, 349, 96 S. Ct. 2392, 2397. Defendant, however, claims that the approximately one-week delay in his learning of Thomas' statement so hampered the preparation of his defense as to have denied him a fair trial and calls for an extension of *Brady*. We find that argument unpersuasive on this record. Defense counsel knew of Thomas' statement before he took the stand. If that statement was so earthshaking as to require complete reorganization of the defendant's case, counsel should have asked for a continuance or recess for that purpose before Thomas testified. His failure to do so is persuasive evidence that the prejudice here alleged was in fact trivial.

For the foregoing reasons, the judgment of the appellate court is reversed and the judgment of the circuit court is affirmed.

*Appellate court reversed;*
*circuit court affirmed.*