THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JOHN T. EINODER, Defendant-Appellant.

First District (1st Division)    No. 78-1545

Opinion filed March 31, 1980.

William J. Harte, Ltd., and Richard J. Prendergast, both of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, James S. Veldman, and Mark X. Vancura, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

John T. Einoder (defendant) was indicted on three charges of possession of a vehicle knowing it to have been stolen (Ill. Rev. Stat. 1975, ch. 95½, par. 4—103(a)), and two charges of possession of a counterfeit certificate of title to a motor vehicle knowing that said certificate was counterfeit (Ill. Rev. Stat. 1975, ch. 95½, par. 4—105(c)). Defendant was found guilty of all charges and was sentenced to three concurrent terms of felony probation for 3 years with the first 3 months to be served on the work release program. Defendant appeals.

We will summarize separately the evidence at trial and at hearing of defendant's motion for a new trial. For clarity we will first summarize defendant's testimony.

Defendant testified he is a businessman engaged as a masonry subcontractor. He is also interested in an electrical subcontracting firm. Defendant owned and had constructed an office building in which his own business was located. Defendant was acquainted with two tenants of the building, Eastman and Vesely. Defendant had done business with both of these men. About March of 1977, defendant's company became the mason subcontractor for construction of a restaurant building in Palos Heights, Illinois. Defendant's company was hired by Burgess Construction Company, the general contractor. This company was operated by Chuck Burgess. Defendant knew Chuck Burgess by another name of Charles Petreikis. Defendant produced business letters, work orders and endorsed cancelled checks signed by this individual as either Burgess or Petreikis in connection with work performed by defendant's company. Defendant had no "reason to disbelieve" Burgess was "other than a responsible and honorable citizen."

We will note here that during trial the use of dual names by this individual tended to cause confusion. The careful trial judge suggested the names be used in combination. We will adopt this suggestion and use the hybrid name "Burgess/Petreikis".

Defendant further testified Burgess/Petreikis told him he had available for sale three Cadillac automobiles. These cars had been repossessed by the Mount Greenwood Bank and could be purchased for $7600 each. This figure would cover the alleged deficiencies due the bank.

Defendant spoke on different occasions to Eastman and Vesely during April of 1977. He explained the situation regarding the cars to them, as Burgess//Petreikis had done for him. Both Eastman and Vesely agreed to purchase a Cadillac automobile on this basis. In addition, defendant told Burgess/Petreikis he would purchase a Cadillac automobile on that basis as a gift for his parents. On each of these occasions Burgess/Petreikis brought the cars to defendant. He also delivered to defendant an envelope containing the certificate of title, applications for transfer of title and a money order covering cost of title transfer. He delivered these items and the automobiles to the purchasers. When Eastman and Vesely bought their cars, defendant did not inspect these documents. Defendant testified he did not believe at the time of the transactions that any of these vehicles had been stolen. Defendant testified the checks received for the Eastman purchase were drawn to his order. He cashed the checks and gave all the proceeds to Burgess/Petreikis.

Defendant testified he sold the automobiles as an agent for Burgess/Petreikis. When the cars were sold Burgess/Petreikis would give defendant the title papers and the car and Burgess/Petreikis would receive the money. Defendant's first knowledge concerning the legal

status of the automobiles was about May 2, 1977, when police officers told Vesely his automobile had been stolen. Vesely called defendant and gave him the information. Defendant testified he immediately called Burgess/Petreikis. Burgess/Petreikis told him it was "impossible" and "there must be a mistake." Burgess/Petreikis told defendant he would get the matter straightened out with the bank. Defendant testified that he believed these statements.

When the police first came to see defendant, about May 5, 1977, defendant gave the police a number of papers such as invoices and letters pertaining to his relationship as a subcontractor for the Burgess Construction Company. He told the officers that "basically" Burgess/Petreikis was the seller of these cars. He also told the police where Burgess/Petreikis could be found.

The State introduced evidence regarding actual ownership and theft of the Cadillac automobiles.

Jerome Eastman testified defendant offered him a Cadillac car for $7600. Defendant told him that was the approximate auction price after a bank repossession. Eastman took the car, drove it and returned it to defendant. Several days later, defendant again asked Eastman about the purchase. Eastman agreed to buy the car. He obtained a check for $7600 payable to defendant. Defendant suggested that Eastman transfer the license plates from another Cadillac parked in defendant's driveway to Eastman's car until he could obtain license plates. Eastman sent the title to the Secretary of State in due course.

Eastman noticed the ignition and door key of the car would open the door on the passenger's side but not on the driver's side. He asked defendant about this. Defendant told him to have the key repaired at a dealer and give the bill to defendant. Some two weeks later, investigators told Eastman they believed his car was stolen. They told Eastman they believed he had no knowledge of this fact. The officers said the price Eastman paid for the car was a fair wholesale price. Eastman remained a friendly tenant of defendant and continued their business activities. In fact, defendant reimbursed him for the entire purchase price of the car. Eastman stated he was familiar with an auction book on automobiles and the price was satisfactory.

Mark Vesely purchased a Cadillac automobile for $7600 from defendant. He made out a check payable to defendant for $6800 and gave defendant a note for the balance of $800. Vesely testified he knew Burgess/Petreikis as Chuck Burgess. Defendant told him the cars in question "came from" Burgess/Petreikis. Vesely saw Burgess/Petreikis driving the car. At one time Burgess/Petreikis asked him how the car rode. Burgess/Petreikis was present in the area of Vesely's office on the day Vesely took delivery of the car. Vesely also testified he had financed

his purchase of the car. Defendant has made regular monthly payments to save Vesely from a loss. Vesely testified that from the "red book" $7600 was a fair wholesale price for the car.

The State introduced evidence regarding false identification numbers found on the two cars and also that the title documents were counterfeit. They were upon a truck format as distinguished from an automobile type. There was testimony that when a bank sells a repossessed car, the title appears in the name of the bank.

Officer Paul Seiler had located the stolen vehicles. About that time, in May of 1977, defendant told Seiler he did not sell the car but that "Chuck Burgess sold" them. Seiler testified defendant did not say he had sold the cars for Burgess/Petreikis. During the following week, defendant told him Burgess/Petreikis had sold the cars to Eastman and Vesely.

Seiler also testified defendant gave him an address for Burgess/Petreikis. He checked the name on the mail box at that address and saw it was "Petreikis." By May 9, 1977, Seiler had ascertained that Burgess and Petreikis were actually the same person. Seiler testified defendant offered "to set up Mr. Burgess." Seiler rejected this proposal.

Officer James Sullivan testified he accompanied Seiler to defendant's office on May 5, 1977. Defendant said, "I didn't sell those cars." During the next week, defendant stated he had "sold the vehicles for Chuck Burgess." Sullivan testified he was informed by defendant that Burgess/Petreikis was the general contractor for a restaurant being built in the suburbs and defendant was one of the subcontractors. Sullivan also stated defendant offered to "set up" Burgess/Petreikis if defendant was left "off the hook."

Janice Einoder, defendant's wife, was the first defense witness. She testified defendant was the brick mason subcontractor at the restaurant site; Charles Burgess, whom she identified in court, was the general contractor. She had seen Burgess/Petreikis driving two or three different cars. She had notarized one of the title documents here involved at the request of Burgess/Petreikis. He told her the signature was that of a friend of his and she accordingly notarized the document. Defendant then testified as above outlined.

Desiree Iacunato, receptionist for defendant in his office, testified Burgess/Petreikis was present at defendant's office from two to four times a week for about a five-week period. This was during the time defendant was subcontractor in the restaurant construction project. She identified Burgess/Petreikis in open court. Upon request by the trial judge, Burgess/Petreikis then stated his name was Charles Petreikis. The witness further testified defendant asked if her parents would like to buy a repossessed car which Burgess/Petreikis could get through the Mount

Greenwood Bank. She told defendant her parents were not interested. She never saw Burgess/Petreikis again after May 5, 1977.

Richard Capo, brother of defendant's wife, testified he was superintendent on the masonry subcontracting job being done at the restaurant. The general contractor was Burgess Construction Company. He saw Burgess/Petreikis at the job on numerous occasions, once or twice every day during the spring of 1977. He also identified Burgess/Petreikis in open court as "Petreikis." At one time, Burgess/Petreikis told the witness he could get repossessed cars from a bank and asked the witness if he wished to purchase one. The witness declined and said he "was saving for a home." Burgess/Petreikis then said there was a possibility of getting a repossessed home through the same bank.

On rebuttal, Officer Sullivan testified defendant told him Jerome Eastman had given him a check as payment for one of the cars. When defendant presented the check, the bank refused to cash it for lack of funds. However, Sullivan testified defendant said the bank gave defendant $5000 in cash and made out a check payable to defendant for $2500.

Charles Petreikis testified under that name. He stated he was the owner of Burgess Construction Company. He had never been known by any name other than Petreikis. He never gave defendant any automobiles or title documents. He denied having received proceeds of the sale of any vehicle. He owns a used car dealership in Wilmette, Illinois. The name "Burgess Construction Company" originated from a previous partnership with a man named Ed Burgess. This partnership had subsequently been dissolved. His company was the general contractor at the suburban restaurant construction site. He had been present continuously at the construction site until about two weeks before the date of his testimony. (He testified on July 28, 1978). The first time he was aware that defendant accused him of selling cars was at the trial.

For defense rebuttal, Richard Capo testified he had not seen Burgess/Petreikis at the restaurant construction site after May 5, 1977.

After defendant was found guilty and before sentencing, defendant moved for a new trial on the ground of newly discovered evidence. On August 30, 1978, the trial court conducted a post-trial hearing. Officer Seiler testified he had prepared a two-page memorandum on June 16, 1978, about one month before trial and 13 months after defendant was arrested. The memorandum set forth that defendant stated he had acted as agent on sale of the car and the license plates belonged to him. The memo stated that on May 5, 1977, and also on May 10, 1977, defendant said he was agent for "Chuck Burgess" in sale of the vehicles obtained after bank repossession. The memorandum shows defendant had then

stated the checks for sale of the Vesely and Eastman cars were drawn to his order and he had given these men the cars and keys. The actual seller was Burgess/Petreikis and defendant was an agent.

In addition, the memorandum shows that defendant gave the police letters with the address of the Burgess Construction Company. The police went to the restaurant construction site but were told by workers that Burgess/Petreikis was not on the job site. A telephone number for Burgess was found to have been registered to Charles Petreikis.

Seiler testified his memorandum was inaccurate in that the Burgess telephone number was not given to him at the site but that he obtained the number from a person who knew Petreikis as Burgess. Also the memo was not correct in that defendant had told the officers that Burgess/Petreikis had sold the cars and he did not. Seiler explained these discrepancies by the fact that the memorandum was prepared by him on June 16, 1978, more than one year after his conversation with defendant.

The second memorandum was a police report signed by Officers Seiler and Sullivan on May 10, 1977. This report stated the investigators had been told by defendant he acted as agent on the sale of the two vehicles and sold them for "another contractor named Chuck Burgess." Seiler testified the memorandum was not accurate in that regard, although it had been prepared at or about the date of the arrests.

The defendant also introduced in evidence photocopies of various bank documents. The parties stipulated these documents were authentic. These exhibits show that on April 29, 1977, Jerome Eastman made an application to Alliance Savings & Loan Association for a cashier's check No. 1786 payable to defendant for $7600. On the same date, application was made for a cashier's check No. 1787 payable to "Chuck Burgess" in the amount of $5000. The back of the cashier's check No. 1787 bears the signatures of "Chuck Burgess" and "C. L. Petreikis." The check was deposited in the Worth Bank on April 29, 1977. The bank had previously encountered difficulty in locating these checks because a roll of film was defective. A witness from the Worth Bank testified an account was maintained in the Worth Bank under the name of "Charles L. Petreikis."

In this court defendant contends the trial court should have acquitted him or granted his motion for new trial because at least one of the State's witnesses had committed perjury at trial; the State failed to correct erroneous testimony by certain of its witnesses and failed to advise the court of certain police reports which contained assertions of material facts contrary to the testimony of certain witnesses; the trial court improperly failed to acquit the defendant or grant him motion for new trial on the basis of newly discovered evidence; and, finally, the evidence presented at trial and during post-trial proceedings was insufficient to find defendant guilty beyond a reasonable doubt.

■■ Under the view we take of this case, we need not consider all contentions of the defendant. In our opinion, the evidence presented at trial, when combined with and evaluated in the light of the post-trial evidence, is not sufficient to prove defendant guilty beyond a reasonable doubt. In *People v. Kilgore* (1975), 33 Ill. App. 3d 557, 560, 338 N.E.2d 124, involving a conviction of the similar crime of possession of a motor vehicle with a falsified identification number, the court required this strong standard of proof:

> "[T]he evidence must be of 'such a conclusive nature as to lead, on the whole, to a satisfactory conclusion, and such as to produce, in effect, a moral certainty that the accused * * * committed the crime, and it must be such that the circumstances proved cannot, upon any reasonable theory, be true and the defendant innocent.' [Citations.]"

In *People v. Gokey* (1974), 57 Ill. 2d 433, 438, 312 N.E.2d 637, the court held:

> "It is of course the function of the trier of fact to determine factual questions and to assess the credibility of witnesses, but where the evidence leaves a reasonable doubt as to the guilt of the accused, we will set aside a conviction."

In the instant case, we do not believe the *Kilgore* and *Gokey* standards have been met. We base this opinion upon careful consideration of the following:

First, the price of $7600 for these automobiles must be regarded as a reasonable wholesale price as opposed to an unreasonably low price. The buyers testified defendant said the cars had been repossessed by a bank. Vesely, an insurance agent, had examined the "red book" and determined the fairness of the price. Eastman testified he was satisfied with the price because of his familiarity with auction books on cars. Eastman further testified the detectives indicated to him this would be a fair wholesale price. This is a major distinction from the typical selling of stolen goods at unusually low prices. It supports a lack of suspicion or guilty knowledge by defendant as well as by the two other purchasers.

Second, the purchasers of the cars were business associates and friends of the defendant. Both rented office space from the defendant. Eastman's office was located some 10 feet from the desk of defendant's wife. Defendant purchased insurance from both men and had accounting statements prepared for his company by Vesely. Defendant himself purchased a Cadillac as a gift for his parents. The other parties to whom the cars were offered for sale included defendant's business associate Dr. Mersinelli, the parents of defendant's wife, defendant's brother and defendant's receptionist. It is difficult to assume defendant would

approach so many persons so closely connected with him to request their participation in an illegal, easily traced act.

Third, defendant testified all proceeds from the sale of the cars were given to Chuck Burgess/Petreikis. This is substantiated by the check for $5000 made out to "Chuck Burgess" endorsed by Burgess and Petreikis and deposited in the account of Petreikis. The only testimony contrary to this is by Burgess/Petreikis, whose credibility has been completely destroyed.

Fourth, defendant's background and position within the community must be considered. He is a married man, and, as the trial court stated, he does not have a "substantial criminal record with substantial prior convictions." He has extensive, self-developed, active holdings in a masonry construction company and an electrical subcontracting company. There is evidence in the record showing defendant's good character and integrity. Compare *People v. Lonzo* (1974), 20 Ill. App. 3d 721, 726, 315 N.E.2d 256, *appeal denied* (1974), 57 Ill. 2d 605.

Fifth, there were troubling inconsistencies between the testimony of Officers Seiler and Sullivan and their two memoranda regarding the statements of defendant in conversations with them on May 5 and on May 9, 1977, as related above. Despite the testimony of the officers, in reliance upon their reports, which corroborate defendant's testimony, we must necessarily conclude that defendant immediately stated his relationship as agent for Burgess/Petreikis, to the officers and never told the officers he was the original seller of these stolen vehicles. This conclusion is required by the fact that the police officers at the post-trial hearing admitted the discrepancies between their trial testimony and both written statements.

Sixth, Officer Sullivan testified on rebuttal that in exchange for Eastman's check for purchase of the car the bank issued a check payable to defendant and not to Burgess/Petreikis. The post-trial documents contradict this testimony. In fact, the bank issued a check payable to "Chuck Burgess." The check was endorsed by that person and by C. L. Petreikis and was deposited in the Petreikis account on the same day it was issued.

Finally, the only witness to deny defendant's version of the transactions was Burgess/Petreikis. However, in light of all of the other evidence, his testimony must be regarded as completely unreliable. Petreikis testified he had never been known by any other name. He further testified he had not been involved in and had not received any of the proceeds of the sales of any of the Cadillacs. However, as shown, the check for $5000 payable to Burgess and endorsed by him and by Petreikis and deposited in his own bank account completely destroys his testimony. The police report, in addition, indicates subsequent investigation

by the police revealed the dual identity sought to be adopted by this individual.

Burgess/Petreikis also testified he did not talk about the charges against defendant with anyone until approximately one month before trial and the day of trial was the first time he heard claims of his providing the stolen cars. However, the trial court was advised of the gentleman's knowledge of his alleged involvement at least three to four months before trial. The conclusion we necessarily reach is that Burgess/Petreikis was a person without credibility. In short, defendant's own testimony strongly supports the theory of his innocence. On the contrary, the testimony of the three principal witnesses for the prosecution is itself creative of grave doubts of the guilt of defendant.

■■ In the instant case, we recognize that the evidence of guilt is basically circumstantial. The standard has been articulated in *People v. Foster* (1979), 76 Ill. 2d 365, 374, 392 N.E.2d 6, that:

> "The [trier of fact] need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances relied upon to establish guilt, but it is sufficient if all the evidence, taken together, satisfies the [trier of fact] beyond a reasonable doubt of the accused's guilt."

■■ If upon careful examination of the entire evidence "there remains a serious and well founded doubt of a defendant's guilt, the conviction must be reversed." (*People v. Sledge* (1962), 25 Ill. 2d 403, 407, 185 N.E.2d 262.) The entire record leaves us with a grave and serious uncertainty that defendant's guilt has been established beyond a reasonable doubt. We therefore reverse the judgment. *People v. Woodall* (1975), 61 Ill. 2d 60, 329 N.E.2d 203.

Judgment reversed.

McGLOON and CAMPBELL, JJ., concur.