THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
DONALD VILLA, Defendant-Appellant.

First District (5th Division)    Nos. 79-871, 79-1447 cons.

Opinion filed February 6, 1981.—Rehearing denied March 5, 1981.

Ralph Ruebner and Nancy Abrahams, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr and James S. Veldman, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

Following a jury trial, defendant was convicted of aggravated battery (Ill. Rev. Stat. 1977, ch. 38, par. 12—4(a), (b)(1), (b)(6)), armed robbery (Ill. Rev. Stat. 1977, ch. 38, par. 18—2) and attempt murder (Ill. Rev. Stat. 1977, ch. 38, par. 8—4), and sentenced to serve a term of 30 to 90 years. On appeal, he presents these issues: (1) the trial court erred in refusing to allow a peremptory challenge; (2) testimony by Drs. Cerullo and Lewis deprived him of a fair trial; (3) the trial court erred in refusing to submit an instruction on prior inconsistent statements; (4) testimony concerning the patrolman's children deprived him of a fair trial; (5) the conviction for aggravated battery is inconsistent with the attempt murder conviction; and (6) the sentences imposed are excessive. We affirm in part and reverse in part. The pertinent facts follow.

On July 12, 1977, Michael Koenig was a cashier and shelf stocker on the 3 to 11 p.m. shift at the 7-Eleven store located in a mini-mall with five other businesses in Tinley Park. At approximately 10 p.m. defendant entered the store, obtained a frozen pizza from the freezer section and approached the cash register with it. Koenig rang up the bill for the pizza and then saw that defendant was pointing a gun at him. Koenig indicated to him that he could have anything he wanted, and defendant asked for keys to the store. As only the store manager had keys to the front door, they proceeded to the manager's desk in the back storeroom. Defendant unsuccessfully attempted to locate the keys in the desk while Koenig was

instructed to lie on the floor. Koenig testified that he was then ordered to his feet and marched at gunpoint back to the front of the store where defendant informed him that he did not wish to hurt him but that he had already killed three people.

Koenig went to the cash register and defendant approached another customer in the store and ordered him behind the counter. Defendant asked them whether they had any money, but told them to keep it as it was their own. Koenig stated that defendant then reached down to the floor safe and removed a bag of change on top of the safe. Another customer had entered the store and he also was ordered to get behind the counter. Defendant asked for keys to the safe and, after being informed that only the manager had them, then ordered Koenig to put the bills from the cash register into the change bag.

Gwenda Sangren and her son, David, then drove up to the store. David entered the store to make a purchase but Koenig told him the store was closed as defendant instructed him to do. However, Gwenda noticed an "open twenty-four hours" sign, and she then went into the store. She was also told that the store was closed, but as she started to leave, Koenig called her back, per defendant's instruction. As she approached the counter, defendant pointed the gun at her. He then motioned for the three men to go toward the rear of the store and led Gwenda there also. After frisking the men for weapons, he made them lay face down on the floor.

Defendant returned to the front of the store with Gwenda, and they started out the front door. He returned to the back of the store and threatened to kill the men if they moved. When he returned to the front again, he placed the money bag into her slacks. He then placed his arm around her and they walked out of the store. They had only gone a few steps when she heard a man ask what was going on. Villa released his hold on her and she looked around and saw that the man who had spoken was a police officer, whereupon, she took refuge behind one of the pillars along the front of the stores in the mall. The money bag was still inside her clothing. She saw another police officer standing almost directly in front of her, and she guided his attention to the happenings behind the pillar.

She heard defendant shout profanities at Officer Louis Jogmen and ask him if he was married. She also heard him threatening to kill Jogmen after asking for his handcuffs. She then saw that the second policeman had his gun drawn and pointed in the direction of defendant. Two gunshots were heard; one from in back of her where defendant and Jogmen were; and one from in front of her where other police officers were located. She began to scream and heard running around her. A police officer approached her, and she gave him the money bag which defendant had placed in her clothing.

Eric Murphy testified that he was sitting in the real estate and

insurance office when his friend, Rod Ohlrogge, entered the office with David. After conversing with them, he phoned the Tinley Park police station.

Officer Louis Jogmen received a radio call concerning the 7-Eleven store at about 10 p.m. He parked his car and drew his service revolver after being informed that something was happening in the store. As he and Murphy approached the store, defendant and Gwenda emerged. Jogmen asked what was happening, whereupon defendant turned and pulled a revolver out of his belt and pointed it at his head, shouting for him to "Drop the f_____ gun or he was going to blow his f_____ head off." He placed his revolver on the sidewalk, and defendant ordered him to lie on the walkway face down. Defendant straddled him and held the gun to his head. Jogmen further stated that defendant asked whether he was married, to which he responded that he was and had a brand new baby.

At this point, Officer David Peterson arrived and ordered defendant to freeze. Defendant ordered him back and threatened to blow Jogmen's head off. Jogmen indicated that he didn't remember anything more until he woke up in the hospital two months later. He had undergone a series of nine operations and required physical, occupational and speech therapy. Among his disabilities is his inability to remember recent events.

Officer Peterson testified that when he responded to the second radio call, he parked north of the realty office and drew his revolver as he exited the squad car. He walked towards the 7-Eleven store and noticed Jogmen lying on the ground with defendant straddling him. He assumed a combat position and ordered defendant to "freeze." Defendant ordered him to back up or he would "blow off his [Jogmen's] mother f_____ head." Defendant then raised his right arm and pointed the gun at him but he retreated behind a pillar.

Officer Allen Bechtel testified that as he approached the store on foot he heard screaming and profanity and saw defendant leaning over Jogmen. Gwenda motioned over her shoulder to show him where defendant and Jogmen were. He placed both hands on his drawn revolver and walked toward defendant's back. Peterson saw Bechtel approaching defendant and attempted to hold defendant's attention. Defendant shouted again that he was going to kill Jogmen. Bechtel saw defendant point the gun at Peterson, whereupon he assumed a combat stance and shot defendant in the top of the back. Both Bechtel and Peterson ran toward the two men, whereupon, Peterson noted that Jogmen was bleeding from a head wound and was also handcuffed. They removed the handcuffs and called for an ambulance. Two revolvers were recovered from the scene, one belonged to Jogmen, and a blue steel revolver belonged to defendant.

Officer David Rogers, who inventoried the three guns involved in the

incident, testified that defendant's gun had been fired a single time since it was last loaded.

Dr. Leonard Cerullo, a neurosurgeon, and Dr. Victor Lewis, a plastic and reconstructive surgeon, testified that they received Jogmen as a patient on July 31, 1977. They performed surgery on him, removing dead brain tissue, bone fragments and reconstructed the skull. Cerullo indicated that the portion of the brain removed controlled recent memory and that there also remains a bullet fragment in the brain, but more damage would be done by trying to remove it than by leaving it in its present position.

Defense counsel moved for a mistrial following their testimony, arguing that it was inflammatory and overwhelming to the jury and unnecessary to prove the element of great bodily harm required by the aggravated battery charge. The motion was denied. The State's exhibits were accepted into evidence, to which defense objected to No. 3, the gun identified as defendant's, and No. 6, a photograph of the gunshot wound in Jogmen's head.

Defense counsel attempted to submit an instruction on prior inconsistent statements because Gwenda had testified differently about the two gunshots that she had told police; however, the court denied this request based on the belief that the statement given to the police and his notes of Gwenda's testimony were similar. Defense counsel also argued that the State's closing argument referring to Jogmen's children was inflammatory. The court sustained an objection but denied the motion for a mistrial.

OPINION

■■ Defendant initially argues that the trial court erred by refusing to allow the defense to exercise a peremptory challenge against a prospective juror. He asserts that after defense accepted the first panel and tendered it to the State, which also accepted the panel, he attempted to have venireman John Spears removed for cause. Spears was asked by the State that if they failed to prove defendant guilty beyond a reasonable doubt, could he sign a not guilty verdict, to which he responded, "I guess I have to." Defense's challenge for cause was denied as was his attempt to then exercise a peremptory challenge.

Defendant accepts the well settled law in Illinois that when both sides have accepted a panel of jurors, it is too late for either side to exercise a peremptory challenge as to any member of that panel previously tendered to the other side. (*Needy v. Sparks* (1977), 51 Ill. App. 3d 350, 366 N.E.2d 327; *People v. Murray* (1966), 73 Ill. App. 2d 376, 220 N.E.2d 84.) However, defendant asserts that under certain circumstances this rule should be relaxed in order to guarantee an impartial jury.

We have examined the record and do not find any evidence of bias in this answer. Spears was subject to extensive voir dire by both sides. There is no indication in his responses of partiality; and the court did not err in refusing to allow defense to exercise a peremptory challenge after both sides had accepted the panel.

Defendant next asserts that the detailed testimony by Drs. Cerullo and Lewis describing the brain surgeries performed on Jogmen was inflammatory and deprived him of a fair trial. He states that the State sustained its burden of proof to the one count of aggravated battery charge requiring infliction of great bodily harm as an essential element when it produced the testimony and appearance of Jogmen, who described his injuries. In addition, a stipulation was read to the jury regarding the testimony of Dr. Danella Boriano, which concerned the extent of Jogmen's injuries and two brain surgeries.

■■ Evidence which could be considered inflammatory will not be withheld if relevant and necessary to an issue in the case. (*People v. Griffith* (1978), 56 Ill. App. 3d 747, 372 N.E.2d 404.) The nature and the seriousness of the injury is an essential element of aggravated battery, and the proof thereof is proper. (*People v. Nard* (1975), 32 Ill. App. 3d 634, 335 N.E.2d 790.) The physicians' testimony described Jogmen's serious injuries and their consequences, which was an essential element in the aggravated battery charge. It is fundamental that a defendant is responsible for the results of his acts, and a jury should be allowed to hear what the great bodily harm inflicted consisted of. (*Nard*, 32 Ill. App. 3d 634, 638, 335 N.E.2d 790.) We, therefore, hold it was not improper to submit this testimony to the jury.

■■ Likewise, defendant's assertion that it was error for the trial court to admit into evidence a photograph of Jogmen's head depicting the gunshot wound and surgical procedures is also groundless. Photographs which have probative value will be received in evidence and are competent even though they are gruesome in their aspect. *People v. Henenberg* (1973), 55 Ill. 2d 5, 302 N.E.2d 27.

Defendant in *People v. Outlaw* (1979), 75 Ill. App. 3d 626, 394 N.E.2d 541, raised a similar issue in connection with murder charges. He asserted, like defendant here, that he did not dispute the nature and extent of the injuries suffered by the victims (the causes or means by which they met their deaths), particularly because of the explicitness of the testimony by the witnesses. Therefore, introduction of this evidence had a highly prejudicial effect on the jury's determination. We adopted the reasoning in *People v. Foster* (1979), 76 Ill. 2d 365, 392 N.E.2d 6, in which our supreme court held it was not error in admitting the photographs, holding that faith in the ability of a properly instructed jury to separate issues and reach a correct decision is the cornerstone of the jury system. The court

indicated that the potentially prejudicial effect of the photographs was due largely to their accurate depiction of a horrible crime, and that the bulwark against prejudicing the jury is the sound discretion of the trial judge. (76 Ill. 2d 365, 378, 392 N.E.2d 6.) We must also note that defendant does not allege that the jury was improperly instructed as to purposes of the photograph. As such, we believe that the trial court did not err in the admission of this photograph.

Thirdly, defendant contends that the trial court erred by refusing to submit a jury instruction on prior inconsistent statements. We reject this contention.

Defendant states that Gwenda testified at trial that she heard two gunshots close together, the first coming from where defendant was and that they were not hard to distinguish. After the two shots, she closed her eyes and screamed. However, in her statement to police immediately after the incident, she indicated that the shots were hard to distinguish and her eyes were closed before the first shot was fired. We held in *People v. Svoboda* (1979), 75 Ill. App. 3d 487, 394 N.E.2d 72, that the function of jury instructions is to convey to the jury the appropriate principles of law so that it may apply the correct legal principles to the facts and arrive at the proper conclusion according to law and the evidence. Defendant also has a right to a full statement of the law from the court, and failure to give a tendered instruction may constitute reversible error. (75 Ill. App. 3d 487, 489, 394 N.E.2d 72.) However, refusal to submit the instruction may be harmless error where the inconsistencies were not material. *Svoboda*; *People v. Alarshi* (1978), 57 Ill. App. 3d 464, 373 N.E.2d 516, *cert. denied* (1978), 439 U.S. 912, 58 L. Ed. 2d 258, 99 S. Ct. 282.

■■ In the present case, Gwenda's statements throughout held that two shots were fired, and there was no question that Jogmen's injuries were inflicted by defendant's revolver. In order to constitute reversible error, the contradictory statements "must have the reasonable tendency" to discredit a witness' testimony on a material matter. (*Alarshi*, 57 Ill. App. 3d 464, 466, 373 N.E.2d 516.) Materiality lies within the discretion of the trial court. (*Svoboda*; *Alarshi*.) The trial judge determined that his notes of Gwenda's testimony was similar to her prior written statement and as such there was no material contradiction. We conclude, therefore, there was no material contradictions of the statements in question, and the trial judge did not abuse his discretion in refusing to submit this instruction.

■■ Defendant next argues that testimony and argument concerning Jogmen's children served only to arouse the passions of the jury and deprive him of a fair trial. Specifically, defense asserts that over objection, Jogmen testified that he had three children, aged 10, 8, and 2 years and that during the State's closing argument his children were mentioned again, to which an objection was sustained. Defendant argues that these

references created the impression that the existence of the children was at issue. We cannot agree. Ordinarily, references to a victim's family is not a proper subject for comment as it has no relevance to the guilt or innocence of the accused and serves only to prejudice him. (*People v. Bernette* (1964), 30 Ill. 2d 359, 197 N.E.2d 436.) However, where such evidence is relevant and otherwise admissible, it is not excluded or barred from prosecutorial comment because it may also have a tendency to prejudice the accused. *People v. Hairston* (1970), 46 Ill. 2d 348, 263 N.E.2d 840, *cert. denied* (1971), 402 U.S. 972, 29 L. Ed. 2d 136, 91 S. Ct. 1658; *People v. Garcia* (1978), 65 Ill. App. 3d 472, 382 N.E.2d 371.

■■ In the first instance, the jury had already been informed, from previous testimony relating to the questions defendant asked Jogmen while he straddled him, that Jogmen had children. The court determined that it was part of the evidence and therefore properly commented upon. The prosecutorial comment made during closing argument stating that "This isn't the same guy—father that his children knew," was objected to and such objection was sustained, thus minimizing any possible prejudice to defendant. Furthermore, we point out that improper remarks generally do not constitute reversible error unless they result in substantial prejudice to the accused. (*People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200; *People v. Nilsson* (1970), 44 Ill. 2d 244, 255 N.E.2d 432, *cert. denied* (1970), 398 U.S. 954, 26 L. Ed. 2d 296, 90 S. Ct. 1881.) In light of the overwhelming evidence adduced against defendant, it is clear that the comments were not so prejudicial as to deny defendant a fair trial.

Defendant next contends that the conviction for aggravated battery must be reversed because it arose from the same act as the attempt murder conviction. The State has conceded on this point on the authority of *People v. King* (1977), 66 Ill. 2d 551, 566, 363 N.E.2d 838. Our supreme court held that

> "Prejudice results to the defendant in those instances where more than one offense is carved from the same physical act."

■■ The shooting of Jogmen served as the basis for both the aggravated battery and the attempt murder conviction. It, therefore, follows that convictions for both of these offenses cannot stand.

Defendant lastly contends that the prison terms of 30 to 90 years for armed robbery and attempt murder are excessive.

Supreme Court Rule 615(b)(4) allows a reviewing court to reduce the sentence imposed by the trial court. However, this power is only exercised when there has been an abuse of discretion. *People v. Lambrechts* (1977), 69 Ill. 2d 544, 372 N.E.2d 641.

In *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882, the issue involved the scope of the power of a reviewing court to modify a criminal sentence. The supreme court stated there that the trial court is generally in

a better position during trial and at the sentencing hearing to make a sound determination as to the punishment to be imposed than the reviewing court, and, further, that "the trial judge's decisions in regard to sentencing are entitled to great deference and weight. * * * [A]bsent an abuse of discretion by the trial court a sentence may not be altered upon review." 68 Ill. 2d 149, 154, 368 N.E.2d 882, 883.

In the present case, the trial court's determination of an appropriate sentence was based on its consideration of the heinous nature of the offenses in question, the effect of these acts on the victim and his family, and defendant's prior criminal background and the fact that he could not be rehabilitated. Defendant's contention that the Department of Corrections has no special facilities for quadriplegics is unsupported by the record, and therefore we cannot give consideration to this on appeal.

■■ We conclude that there was no abuse of discretion in arriving at the sentences imposed and that they are not excessive.

For the foregoing reasons, the judgment of the trial court is affirmed except for the conviction for aggravated battery, which is reversed.

Affirmed in part; reversed in part.

SULLIVAN, P. J., and MEJDA, J., concur.